197 N.J. Super. 489 (1984)
485 A.2d 323
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
TEDDY JORDAN, DEFENDANT-APPELLANT. STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
GEORGE MURPHY, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued and Submitted December 3, 1984.
Decided December 20, 1984.
*491 Before Judges MORTON I. GREENBERG, O'BRIEN and GAYNOR.
John M. Apicella argued the cause for appellant Teddy Jordan (Joseph H. Rodriguez, Public Defender, attorney).
Carol M. Henderson, Deputy Attorney General, argued the cause for respondent in A-2562-82T4 (Irwin I. Kimmelman, Attorney General, attorney).
Joseph H. Rodriguez, Public Defender, attorney for appellant George Murphy (William Welaj, Designated Attorney, on the brief).
*492 Irwin I. Kimmelman, Attorney General, attorney for respondent in A-3452-81T4 (Richard Coughlin, Deputy Attorney General, on the brief).
The opinion of the court was delivered by MORTON I. GREENBERG, P.J.A.D.
This matter comes on before this court on appeal from judgments of conviction for murder. We reverse the convictions and remand the case to the trial court for a new trial for each defendant. We do this even though the verdicts were amply supported by the evidence for the very serious trial errors in this matter were clearly capable of producing an unjust result and indeed made convictions particularly of one defendant a virtual certainty. See R. 2:10-2; State v. Macon, 57 N.J. 325 (1971).
On July 30, 1981 an indictment was returned in Essex County charging defendants Teddy Jordan ("Jordan") and George Murphy ("Murphy") with the murder of Calvin Reddick, contrary to N.J.S.A. 2C:11-3 (Count I), and with the unlawful possession of a rifle without a firearms purchaser identification card, contrary to N.J.S.A. 2C:39-5c(1) (Count II). At a single jury trial both defendants were convicted on each count, the jury finding Murphy guilty on the murder count as an accomplice. Murphy's post-trial motion for a judgment of acquittal was denied. Defendants were sentenced to lengthy prison terms and were assessed penalties for the use of the Violent Crimes Compensation Board. Defendants separately filed appeals from the judgments of conviction which we consolidate for purposes of disposition.
The facts in this case were sharply in dispute as each defendant accused the other of killing Reddick. In the circumstances we set them forth initially in a manner consistent with the verdict which indicates that the jury found Jordan had fired the weapon and Murphy was his accomplice. The homicide had its origin in problems defendants were having with their narcotics *493 business which they both testified was started in Newark in 1976. Jordan testified he was in charge of the operation. The business obviously was risky for Jordan was shot twice. Consequently in April or May 1981 he decided to obtain a weapon for protection. According to the testimony of Clarence Warren, an acquaintance of Jordan, Jordan discussed the purchase of the weapon with him in the presence of Murphy. Murphy indicated that this conversation took place in an apartment in a building on McCarter Highway in Newark where members of the Jordan family including Jordan, his brother, Barry Jordan, and his mother resided. It was in this building that Reddick was later shot. Following Warren's conversation with Jordan, Warren sold him a .357 Magnum. According to Murphy, Jordan told him he intended to kill Walter Adams with the gun. Murphy indicated that Barry Jordan assisted Jordan in his plans by making a ski mask for him. Jordan decided, however, that the revolver was so big he could not control it and accordingly he asked Warren to secure a different weapon for him.
Warren testified that he found a rifle for sale at a tavern near the apartment. At a meeting in Jordan's apartment Warren advised Jordan of the availability of the rifle. Murphy was in the apartment at that time though he may have been sleeping. Jordan and Warren then went to the tavern where Jordan gave Warren money for the purchase of the rifle and three cartridges. After they acquired the rifle and placed it in the trunk of Warren's car, Jordan and Warren went to Jordan's apartment. Murphy and Barry Jordan were there when they returned and, according to Warren, Barry Jordan brought the weapon from the car into the apartment.
Jordan then changed his plans. Murphy testified that Jordan decided to kill Calvin Reddick instead of Walter Adams. Jordan disliked Reddick because of the latter's efforts to expand his drug business. Reddick had, to the annoyance of Jordan, made an approach to Jordan's father concerning taking over a drug operation in north Newark. Jordan told Murphy that he was *494 not going to let Reddick dictate his business and he intended to kill him. The plan was not complicated. Jordan anticipated that Reddick would come to the McCarter Highway apartment building inasmuch as Ennise Moore, Reddick's girl friend, lived in the building on the same floor as Jordan. Murphy testified that Jordan intended to climb out of his apartment window and enter an abandoned apartment from which he would shoot Reddick. According to Murphy and Warren, Jordan test-fired the rifle out of the back window of his apartment in their presence and in the presence of Barry Jordan. Effectively that reduced Jordan's ammunition supply to one bullet inasmuch as one of his remaining bullets was the wrong size for the rifle. Murphy testified that Jordan asked Barry Jordan to help set up Reddick by stopping him in the hallway to talk.
The plan was brought to fruition. On May 5, 1981 at approximately 11:30 p.m. Moore, her brother, Alphonso Scott, and a friend were leaving the building as Reddick entered. Moore and Reddick talked to each other in the doorway of the building while Scott spoke to Barry Jordan. Moore then walked out of the building toward her car where her friend was standing. As Moore reached for her keys she heard a loud bang. She then turned around and saw Reddick lying on the floor in the building. He had been shot in the back and had suffered massive internal injuries from which he died. Moore went to Reddick's aid while Scott and Barry Jordan called an ambulance. Scott and Barry Jordan then each obtained a revolver and ran from the building in an unsuccessful attempt to locate the assailant. On the street Scott was stopped by police and arrested for possession of the weapon. The police, however, made no immediate arrest for the homicide.
The following day, May 6, 1981, Warren asked Jordan if he was aware of Reddick's death. Warren testified that Jordan, in the presence of Murphy and Barry Jordan, just smiled and said, "We got him," a comment Warren said he regarded as a joke. At that time the rifle was still in Jordan's apartment where Warren saw it after the shooting.
*495 The investigation of the homicide was not initially successful. But on June 9, 1981 Murphy had a conversation with the police which resulted in his directing them to an area of north Newark near a railroad track where they found a rifle wrapped in a dark plastic garbage bag. Ballistics tests established that Reddick was killed with a shot fired from this rifle.
The critical issue on this appeal derives from the State calling Barry Jordan as a witness. The State quite naturally considered that he had information about the case and consequently it called him as a witness at the trial. Before he was sworn the judge inquired whether there was a need for an Evid.R. 8 hearing for evidently the judge questioned whether Barry Jordan intended to testify. The prosecutor represented that there was no need for such a hearing, a representation immediately challenged by Murphy's attorney who told the judge he had interviewed Barry Jordan within the last two days and Barry Jordan said he may assert his Fifth Amendment rights. The judge said the prosecutor's representation was as good as that of Murphy's attorney. Murphy's attorney said that if Barry Jordan took the Fifth Amendment in the presence of the jury there would be a mistrial. An attorney representing Barry Jordan was present in court and advised the judge that his client had been indicted for giving false information inasmuch as he had given three contradictory sworn statements to the police concerning the murder. Barry Jordan's attorney was concerned that any statements made by his client in court would be used against him. But he did not know whether Barry Jordan would assert Fifth Amendment rights. Notwithstanding this information the State adhered to its representation that Barry Jordan intended to testify. The court accepted this representation and consequently Barry Jordan was routinely sworn as a witness in the presence of the jury without any preliminary inquiries being made of him.
After Barry Jordan responded to a few preliminary questions, including one which he answered by indicating that at the time of the homicide he lived in the building where Reddick was *496 killed, the prosecutor asked him whether he was present when Reddick was shot and killed. Barry Jordan responded by saying "excuse me." The judge then sent the jury from the courtroom. Barry Jordan then told the judge, "Upon my Fifth Amendment I refused [sic] to answer any questions, other than where I live at, residence and my home." The prosecutor then stated: "This comes as a surprise to me, sir." The prosecutor then asked that Barry Jordan be required to invoke his Fifth Amendment rights before the jury. That, however, did not happen. Instead the court recessed for the day.
Barry Jordan was recalled the next day. A court officer said he didn't want to come in. While the record is not clear on the point, apparently force was required to obtain his presence. Before the jury was seated he again stated that he refused to answer any questions other than his name and address. When the judge asked why he refused Barry Jordan stated, "I just refused [sic] to answer any questions. I don't understand what I am in here for." The judge ruled that the witness had not properly invoked his privilege against self-incrimination because he did not state his reasons for doing so. Counsel for Murphy again asked for an Evid.R. 8 hearing which the judge again refused. Murphy's attorney brought State v. Fournier, 91 N.J. Super. 477 (App.Div. 1966) and State v. Cullen, 103 N.J. Super. 360 (App.Div. 1968) to the attention of the court.[1] Barry Jordan then attempted to leave the witness stand, a ploy which the judge frustrated by having him handcuffed to the stand. Once more Murphy's attorney asked for an Evid.R. 8 hearing. The judge asked Barry Jordan why he claimed a Fifth Amendment right not to answer questions. Barry Jordan indicated that because of his upcoming trial for making false statements he might incriminate himself. Over defendants' objections the judge seemingly attempted to grant Barry Jordan *497 use immunity by informing him "that anything you say here which I shall order you to answer may not be used by the State against you in the prosecution of that case." The judge then ordered Barry Jordan to testify.
After some further delay the jury was brought in and Barry Jordan was questioned in its presence by the prosecutor. He answered a few preliminary questions. Specifically he said that he knew Murphy and that Jordan was his brother. He also answered questions about defendants' addresses. He said he did not remember whether he knew Reddick. He was then shown pictures of Reddick but he would not say whether he could identify them. He simply stayed silent when asked about them. He would not say whether he knew Reddick's mother. Defendants objected to this procedure inasmuch as the unanswered questions were asked in the presence of the jury. The judge allowed the questioning to go on. The prosecutor asked Barry Jordan if Murphy had handed him a note and again he would not answer. The jury was then excused and the court again instructed Barry Jordan to answer the questions but he just sat there silently. Defendants moved for a mistrial. They argued that they were denied a fair trial by the State being permitted to ask questions of Barry Jordan in the presence of the jury while the witness remained silent. Defendants said that this was happening even though the State knew he would refuse to answer questions. The court denied the motion. The judge ruled that there was no damage to any of the substantive rights of defendants even though the jury could hear and see the witness refuse to answer questions. The court then held Barry Jordan in contempt and the witness left the stand.
The prosecutor offered two autopsy photos of Reddick into evidence. One showed his wound and was admitted without objection. The other showed him lying on his back face up. This picture revealed no injuries except a minor abrasion of his head but it showed the corpse having been stitched from shoulder to groin after the autopsy. Defendants objected to its admission. They argued that inasmuch as Reddick was shot *498 once in the back, the photo was not probative of any fact in issue and was prejudicial. The court admitted the photo because it showed Reddick's face.
After the State rested both defendants moved for a judgment of acquittal but their motions were denied. Defendants rested without testifying. They then renewed their motions for acquittal which were again denied.
The attorneys then summed up. During his summation the prosecutor hit hard at the testimony of Barry Jordan. He particularly emphasized his silence.
We then come to Barry Jordan, because we did have Barry Jordan here for a short time. We did hear his testimony for a few answers. Then we heard his silence, we did not hear anything. Because we learned from Barry Jordan that yes, the defendant Teddy Jordan is my brother. `Yes, I know the other defendant, George Murphy. I know him for some time.' I think he may have even said that they have a friendship. They had a friendship at the time.
The prosecutor argued to the jury that Barry Jordan's refusal to answer questions was motivated by a desire to help his brother. The prosecutor hammered home the point by telling the jury: "I submit to you that is an attempt to conceal, his silence." Following summations defendants moved for a mistrial. They considered the prosecutor's summation to be highly prejudicial. The court denied the motion.
The case then took an extraordinary turn. Murphy gave the prosecutor a note stating that Jordan committed the crime and that Murphy wanted to take the stand in his own behalf. Jordan moved for a mistrial but this motion was denied. Jordan then said that he wanted to take the stand as well. The judge reopened the case and allowed defendants to testify.
Murphy's testimony has already been described. He inculpated Jordan and described Barry Jordan's involvement with him. Jordan denied shooting Reddick. He claimed that Murphy did it and that Murphy told him he did it. Although he admitted buying the Magnum from Warren, he said he never bought a rifle from him. Rather Warren had once brought the rifle over to Jordan's apartment where Murphy saw it and *499 inquired about it since he needed a weapon to protect himself from Reddick. Consequently Jordan induced Warren to agree to lend the rifle to Murphy. Jordan said he gave the rifle to Murphy one week before the shooting. Jordan testified that he did not see the weapon again until two weeks after Reddick had been shot when Murphy brought it to Jordan's apartment. Jordan testified that Murphy said he could no longer keep the rifle at his residence. Jordan stated he gave Murphy a dark plastic garbage bag and Murphy left with the garbage bag and the rifle. He did not see the rifle again until after the police recovered it. Jordan testified that on the day of the murder he was in New York. But the prosecutor successfully objected to this evidence on the ground that Jordan had never served a notice of alibi.[2] The judge then instructed the jury to disregard Jordan's testimony that he was in New York on the day of the homicide.
The parties again summed up. In the judge's charge he indicated that Murphy could only be an accomplice to the murder. While the judge stated that an accomplice was as culpable as a principal[3] he foreclosed the jury from finding that Murphy fired the shot that killed Reddick. The prosecutor and Jordan objected. They asked that the court also charge that the jury could find Murphy guilty as a principal of the murder. The court refused. The jury subsequently found Jordan guilty of murder and unlawful possession of a weapon and Murphy guilty of murder as an accomplice and unlawful possession of a weapon. These appeals followed.
On this appeal Jordan and Murphy contend they were deprived of a fair trial by the judge allowing the State to question Barry Jordan after he had invoked a Fifth Amendment privilege against self-incrimination. They further assert their motions for acquittal should have been granted. Jordan argues *500 that the court erred in refusing to charge that Murphy could be guilty of murder as a principal and in admitting the photographs of Reddick. Murphy contends that the prosecutor's summation in which he commented on Barry Jordan's refusal to testify was prejudicial.[4]
We deal first with defendants' contentions that at the end of the State's case each was entitled to a judgment of acquittal. The judge analyzed the evidence as it then stood and denied the motions. In reviewing the judge's ruling we do not consider the evidence received after the motions were denied. See State v. Reyes, 50 N.J. 454, 459 (1967).
The standard a trial judge follows on this issue was set forth in State v. Reyes, supra, 50 N.J. at 458-459 and recently reiterated by the Supreme Court in State v. Martinez, 97 N.J. 567 (1984). The trial judge must deny a motion for acquittal if viewing the State's evidence in its entirety, be it direct or circumstantial, and giving the State the benefit of all its favorable testimony as well as all of the favorable inferences which reasonably could be drawn therefrom, a reasonable jury could find guilt beyond a reasonable doubt. The State established that Jordan had purchased and test-fired the murder weapon before the homicide. The murder occurred in his apartment building. No assailant was seen leaving the building thus giving rise to an inference that the killer remained inside. After the killing Jordan indicated that "we" got Reddick. Further the weapon was found in Newark.
Murphy and Jordan were close friends. Murphy was present when Jordan discussed the purchase of the rifle with Warren and was present when the rifle was brought back to the apartment and Jordan test-fired it. Further it was Murphy who led the police to the rifle. It is also significant that when Jordan told Warren "we" got Reddick, Murphy was there. We *501 are satisfied that on the State's case a reasonable jury could have found both defendants guilty beyond a reasonable doubt. Consequently the motions for acquittal were properly denied.
We are convinced, however, that the procedure followed when the State called Barry Jordan as a witness requires that both defendants be granted a new trial. The prejudice to them is beyond question. Barry Jordan is a brother of one defendant and a friend of the other. The testimony established that Barry Jordan was so involved with defendants that there is an inescapable inference he knew what had taken place. The jury had every reason to believe that his silence in its presence was a product of an effort to protect defendants. Indeed this is precisely what the prosecutor asserted in summation when he said that Barry Jordan's silence was "an attempt to conceal." It is perfectly clear that the prosecutor aggravated the obvious prejudice by his argument in summation.
At oral argument before us Jordan's attorney suggested that the prosecutor intentionally prejudiced defendants. From our review of the matter we have concluded that this may well be the case. Firstly we point out that the prosecutor adhered to his representation that Barry Jordan would testify when even his own attorney could not say what he would do. Secondly the prosecutor told the judge that Barry Jordan should be required to claim the Fifth Amendment in the presence of the jury. Finally, and perhaps in his most inexcusable act, the prosecutor in his summation emphasized that Barry Jordan had remained silent in an attempt to conceal evidence. We regard the prosecutor's argument in summation as highly improper. He certainly did intentionally prejudice defendants at that time. In any event we conclude that the prejudice to defendants was so severe that even if the prosecutor's conduct was innocent new trials must be granted.
We also point out, of course, that the trial judge mishandled the matter. In view of the warnings from Barry Jordan's attorney and Murphy's attorney as to Barry Jordan's intentions *502 the judge should not have accepted the prosecutor's representations. The judge's initial thought that a preliminary hearing should be held was correct.
The appropriate procedure that the trial court should have followed was set forth by the Supreme Court in State v. Jamison, 64 N.J. 363 (1974) as follows:
When the State calls as a witness an accomplice of the defendant or one known to have had some connection with the crime, knowing the witness will plead his privilege against self-incrimination, it is ordinarily preferable first to examine the witness on voir dire, as otherwise the circumstances may lead the jury to draw unfavorable inferences against defendant. This is particularly so if after the witness's refusal to answer, the prosecutor asks questions as to prior statements by the witness reflecting on defendant. See State v. Fournier, 91 N.J. Super. 477, 480-481 (App.Div. 1966); State v. Cullen, supra (103 N.J. Super. at 364.) In the court's discretion, the State may be precluded from calling such a witness before the jury if he declined to testify on voir dire. [64 N.J. at 373-374 n. 1]
In State v. Fournier, supra, 91 N.J. Super. at 477, this court indicated that when the prosecution offers a witness who appears to be in complicity with a defendant, who then refuses to testify on grounds of constitutional privilege, such tactic will require a reversal if the prosecutor knew in advance or had good reason to believe the witness would claim his privilege against self-incrimination. We indicated, of course, that each case is peculiarly dependent on its own facts, particularly with relation to the culpability of the prosecutor's tactical approach and as to the factor of actual prejudice. We further indicated that when a witness in apparent complicity with the defendant is called by the State the prosecutor should inquire of the witness in advance as to whether he intends to testify and then inform the judge and defense attorney of the result of the inquiry before going ahead in open court. We adhered to the Fournier approach in State v. Cullen, supra, 103 N.J. Super. at 360, where we indicated that once it was established that a witness intended to claim a privilege not to testify the court committed prejudicial error by permitting the prosecutor to continue his questioning and thereby place before the jury *503 innuendo evidence or inferences of evidence which the State could not get before the jury by direct testimony of the witness.
We recognize that the State questions Barry Jordan's substantive right to assert a privilege not to incriminate himself and his procedural method in claiming a privilege. Further we are aware that the judge seems to have attempted to grant Barry Jordan use immunity.[5] Thus the State urges that Barry Jordan should have testified. But we will not decide whether Barry Jordan lawfully remained silent because this case does not involve an appeal by him from a contempt conviction. Regardless of the propriety of his conduct defendants have been severely prejudiced. It is true that in Jamison, Fournier and Cullen the courts did not consider what the law is if the privilege is not appropriately claimed. But in Commonwealth v. Davenport, 453 Pa. 235, 239, 308 A.2d 85, 87 (Sup.Ct. 1973) and People v. Poma, 96 Mich. App. 726, 294 N.W.2d 221 (Ct. App. 1980) appellate courts in Pennsylvania and Michigan made it clear that even if the witness wrongfully claims a privilege not to testify he should not be placed on the stand in front of the jury for the prejudice to the defendant is not dependent on the validity of the claim of privilege. We are persuaded to follow those decisions. We hold this case must be decided on the basis of what happened not what should have taken place. *504 Defendants were severely prejudiced and they must be given a new trial.
In addition Jordan was severely prejudiced by the judge's charge that Murphy could only be found guilty as an accomplice. When that charge was given each defendant had indicated that the other had killed Reddick. While the judge was obviously skeptical about Jordan's testimony, the fact is that Jordan said it was Murphy who had done the killing. If so, Murphy was not simply an accomplice. The impact of the judge's charge was that Jordan was not truthful in his evidence for the judge required the jury to disbelieve him. In view of the rest of the testimony which tended to establish defendants' involvement in the homicide, the judge's specific direction that Murphy could only be an accomplice even in the context of the judge's general statements regarding the jury's function as the sole finder of the facts came close to charging that Jordan was guilty. This was an impermissible invasion of the jury's function. See State v. Ingenito, 87 N.J. 204, 210-213 (1981); State v. Lopez, 188 N.J. Super. 170, 173 (App.Div. 1983). When the prosecutor and Jordan objected to the charge the judge should have amended it to allow the jury to find that Murphy was the assailant.
Finally we address the issue of the photographs. There was nothing improper in admissibility of the photograph showing Reddick's wound. But defendants' objections to the photograph showing Reddick on his back after the autopsy stitched from shoulder to groin should have been sustained. As defendants pointed out the photograph proved nothing inasmuch as Reddick had been shot in the back. It was simply inflammatory. While there can be no doubt but that a ruling on the admissibility of a photograph is discretionary on the retrial it should not be admitted. See State v. Thompson, 59 N.J. 396, 421 (1971).
*505 The judgment of conviction is reversed and the matter is remanded to the Superior Court, Law Division, Essex County, for a new trial. We do not retain jurisdiction.
NOTES
[1] He mentioned the names of the cases but did not supply citations. See United States ex rel. Fournier v. Pinto, 408 F.2d 539 (3 Cir.1969) for Fournier in the federal courts.
[2] See R. 3:11-1 and R. 3:11-2.
[3] See N.J.S.A. 2C:2-6(b)(3).
[4] Defendants raise additional points which in view of our result we need not address. They are not likely to reoccur at a new trial.
[5] A trial court has recently stated that a judge in certain circumstances may be required by due process considerations to grant a witness called by a defendant use immunity. State v. Summers, 197 N.J. Super. 510 (Law Div. 1984) (decided June 27, 1984; approved for publication November 26, 1984). But prior cases indicated that a judge does not have power to grant use immunity. Rather the procedure for a witness to obtain such immunity is statutory. Accordingly we are not to be understood to suggest that if the trial judge had properly conducted a hearing before Barry Jordan had appeared before the jury he could have granted him use immunity. See N.J.S.A. 2A:81-17.3; State v. DeCola, 33 N.J. 335, 352 (1960); Whippany Paper Board Co. v. Alfano, 176 N.J. Super. 363, 370 (App.Div. 1980). It is clear, however, that if Jordan properly claimed a privilege not to testify and was compelled to do so his testimony could not be used against him. See State v. DeCola, supra, 33 N.J. at 352-353.