794 A.2d 246 (2002)
350 N.J. Super. 20
STATE of New Jersey, Plaintiff-Respondent,
v.
John TAYLOR, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued March 12, 2002.
Decided April 10, 2002.
*248 James K. Smith, Jr., Assistant Deputy Public Defender, argued the cause for appellant (Peter A. Garcia, Acting Public Defender, attorney; Mr. Smith, of counsel and on the brief).
Linda A. Rinaldi, Deputy Attorney General, argued the cause for respondent (Peter C. Harvey, Acting Attorney General, attorney; Ms. Rinaldi, of counsel and on the brief).
Appellant filed a pro se supplemental brief.
*249 Before Judges PRESSLER, CIANCIA and PARRILLO.
*247 The opinion of the court was delivered by PARRILLO, J.A.D.
Following a jury trial, defendant John Taylor was found guilty of murder (N.J.S.A. 2C:11-3a(1) and (2)) (Count 1); second-degree conspiracy to commit aggravated assault (N.J.S.A. 2C:5-2 and N.J.S.A. 2C:12-1(b)(1)) (Count 2); second-degree aggravated assault (N.J.S.A. 2C:12-1(b)(1)) (Count 3); third-degree conspiracy to commit aggravated assault with a deadly weapon (N.J.S.A. 2C:5-2 and N.J.S.A. 2C:12-1(b)(2)) (Count 4); third-degree aggravated assault with a deadly weapon (N.J.S.A. 2C:12-1(b)(2)) (Count 5); fourth-degree unlawful possession of a weapon (N.J.S.A. 2C:39-5(d)) (Count 6); third-degree possession of a weapon for an unlawful purpose (N.J.S.A. 2C:39-4(d)) (Count 7); and fourth-degree obstructing justice (N.J.S.A. 2C:29-1) (Count 12).[1] After merging the convictions on counts two through seven into count one, the trial court sentenced defendant to a life term of imprisonment with a thirty-year parole disqualifier on the surviving murder count and a concurrent eighteen-month term on count twelve. On the same day, the trial court sentenced defendant on a violation of probation[2] to a four-year term of imprisonment, which was to run consecutively to the sentence imposed for the murder conviction. Defendant appeals. We reverse defendant's conviction for purposeful or knowing murder and for the offenses merged therein because: (1) the prosecutor elicited testimony from the investigating police officer that other unidentified, non-testifying individuals had implicated defendant in the murder; (2) the trial court erroneously admitted into evidence a videotape depicting the last three and one-half minutes of the victim's life on the basis of a brief "dying declaration" that was testified to by three other witnesses; and (3) the trial court failed to charge the jury on passion-provocation manslaughter even though the evidence clearly indicated a basis for that charge. These errors affect the remaining conviction for obstruction of justice, which we also reverse.

I.
Gregory Hendricks died as a result of a single stab wound to the chest, penetrating the heart and lung. He was stabbed shortly before 6:00 p.m. on May 19, 1997 on the street outside the Atlantic City apartment of Margenese Bell, his ex-girlfriend and mother of his two children. Bell was pregnant at the time, but she did not know whether the father was Hendricks or defendant, her then boyfriend.
Apparently there had been animosity between the two men, as defendant had expressed concern to his friends over a prior incident in which Hendricks and his brothers supposedly tried to jump him. On the evening before the stabbing, defendant was at Bell's apartment when he overheard Bell's mother say that she had seen Hendricks poke Bell in the ribs. The next day, May 19, 1997, defendant informed his friends Kevin Stevenson and Dwayne Roberts that he had a "problem" *250 with Hendricks that he needed to "handle." Stevenson and Roberts agreed to back defendant up in a fight if Hendricks brought other people with him. Both Stevenson and Roberts assured defendant that they were not "going to let nobody jump him," and that "it was going to be a fair fight ..." They arranged to meet at Bell's apartment later that day, where defendant had learned Hendricks would be arriving at around 5:00 p.m. Earlier that morning, at about 7:00 a.m., Bell had telephoned Hendricks' mother, Bernice Livingston, to ask her to have Hendricks drop off a box of Pampers for the children after work.
As planned, defendant, Stevenson, Roberts, and another friend, Marvin Burke, along with Bell and defendant's sister, fifteen-year-old Stephanie Taylor, were at Bell's apartment later that afternoon. Defendant and his three friends were "having a session" drinking, smoking marijuana, and playing video games in the second floor apartment. While they were "chilling," the conversation turned to what was going to happen during the fight with Hendricks, and defendant pulled a knife from his pocket and said, "if shit gets hectic, I'll shake him." This was interpreted by Roberts as meaning defendant might use the weapon defensively if necessary. Stevenson "just thought it was going to be a fight."
At about 5:30 that afternoon, Bernice Livingston drove up to the apartment parking lot in her red pickup truck accompanied by her son, Gregory Hendricks, and a relative, Seaford "Tony" Brody, the three of them having finished work at the Atlantic City Press where they were all employed. Ms. Livingston took the package of Pampers and headed for the stairs that led up to Bell's apartment, while Hendricks and Brody stayed in the truck. Meanwhile, Stephanie Taylor, who had been standing by the window, advised defendant that Hendricks had arrived. According to Stevenson, defendant grabbed what appeared to be a steak knife, put it in his waistband, and ran downstairs, followed by Stevenson and Roberts. The three men ran by Livingston, who did not see any of them with weapons. By then, Burke had left Bell's apartment before Hendricks arrived.
The versions of the ensuing confrontation differ, but by all accounts it started as a verbal engagement. Either Roberts or defendant approached the truck first, with the other two staying behind in the alley, "like hiding." According to Stevenson and Roberts, defendant ran up to the passenger side of the truck where Hendricks was sitting and began arguing with him about "why he put his hands on his girl or his baby's mom." According to Brody, who was sitting in the cab of the truck with Hendricks, a "short guy" in dark-colored clothes first approached and said "what is this bull crap that you were telling my baby's mother." Roberts was wearing a dark-colored shirt and black pants, whereas defendant was wearing a red or orange shirt and fatigue pants. Roberts had fathered a child with a woman named Tammy White, whom Hendricks was then seeing. In any event, eventually both defendant and Roberts were arguing with Hendricks.
At this time, Hendricks reached into the glove compartment and appeared to retrieve an object that he put under his shirt. In fact, Hendricks kept putting his hand under his shirt, acting as if he may have had a gun, and kept telling the trio to move away from the truck. In the meantime, Brody, who had been sitting in the middle seat, got out of the truck from the driver's side. Hendricks also exited the truck from the driver's side, holding an object in his hand that turned out to be an *251 E & J Brandy bottle. Hendricks and the trio began circling the truck. It was at this time that the confrontation escalated from verbal to physical, and the accounts grow even more disparate.
According to Roberts, Hendricks started the physical altercation when he "cracked me in my face with the [brandy] bottle." Stevenson testified the confrontation became physical when he picked up a metal pipe from the back of the truck and hit Hendricks with it on the legs. Roberts then took hold of the pipe from Stevenson and hit Hendricks twice in the knees, only to lose control of the pipe temporarily in a struggle with Brody. Stevenson and defendant "started jumping" Hendricks. At around this time, a car driven by Ricky Williams pulled up to the scene and its occupant, Bobby Clark, a member of the same gang as defendant and his friends, got out and briefly joined in the fight, throwing a few punches at Hendricks. Clark saw defendant swinging "a sharp object" at Hendricks while Hendricks was trying to "go for [defendant's] head" with the bottle. In fact, according to Clark, Hendricks was about to hit defendant with the bottle when Clark intervened and "smashed the bottle" over Hendricks' head instead. Stevenson also witnessed Hendricks swinging the bottle, but said the victim did not connect. At some point the bottle dropped to the ground.
At some point, Hendricks tried to back into the truck's open driver's side door. According to Stevenson, as Hendricks struggled to get into the truck, defendant pulled the knife out of his pocket, told Stevenson to move out of the way and, as Hendricks's legs were dangling "halfway to the ground," stabbed him in the chest. Stevenson was the only participant who witnessed the stabbing. By that time, Clark had returned to the car and had not seen Hendricks get stabbed. His driver, Ricky Williams, did not see the stabbing nor anyone with a knife. The victim's cousin, Tony Brody, who participated in the melee, saw neither the stabbing nor anyone wielding a knife. Neither did Roberts witness the stabbing. The victim's mother, Bernice Livingston, saw some of the fracas from Bell's window but, by the time she got outside, her son was fleeing and someone other than defendant was pursuing him, swinging a pipe. There was a fifteen-year-old boy, Lewis Johnson, who was playing basketball nearby, who saw someone from the group, wearing a red shirt, pull "something shiny" out of his back pocket and swing it three times at the victim. Although Johnson apparently later selected defendant's photo from a photo array, which included photos of all the participants, as the person who stabbed Hendricks, he did not identify defendant at trial, nor did he say that he had seen Hendricks being stabbed. The knife used to stab Hendricks was never recovered.
After being stabbed, Hendricks "broke loose" and ran across the parking lot into a nearby grocery store where the owner, Farub Kahn, called an ambulance and turned on the store video to document the event. Roberts, who had chased Hendricks into the grocery store, striking him with the pipe four or five times, ran out when he realized the victim, covered with blood, had been stabbed. Hendricks, bleeding profusely from his chest, fell to the floor behind the counter. Police arrived at the store moments later and found Hendricks behind the counter trying to get up, looking "very, very, very scared," and having a "very hard time breathing." Hendricks, however, was able to tell the officers his name and, when his mother entered the store screaming, managed to tell her that he "was going to die." The officers asked Hendricks who had stabbed him, and his mother urged him to "[t]ell *252 them who did it." Twice, Hendricks stated that "Johnny" had stabbed him. One of the officers asked him if "John" was "white or black," and the victim replied that he was "black." At that point, his "eyes rolled back in his head and he lost consciousness." This entire ordeal was captured on the grocery store's video camera, which was confiscated by police a short time later.
The police investigation began immediately. Ms. Livingston directed police to Bell's apartment, where she said the suspect lived and where in fact Stevenson had retreated after the stabbing. When police first came to the apartment asking for "Johnny," both Bell and Stevenson gave them false names at first, although Stevenson eventually gave his real name. Bell, however, did not. When asked who "Johnny" was, Bell told police he was "nothing to her." She proceeded to give a "totally different" description of him, and told them that the man they were looking for was really named "Jack."
The next morning, Roberts and defendant together telephoned Stevenson from a home in Pleasantville and told him to tell the police that Clark had stabbed Hendricks. Apparently, at that time Roberts believed they were telling Stevenson the truth because, immediately after the incident, that is what defendant had told him had happened. Stevenson, however, witnessed the stabbing and knew otherwise. Nevertheless, Stevenson called the police that morning and turned himself in. He gave two statements that day, both implicating Clark. However, in a third statement to the police two days later, Stevenson said that defendant stabbed Hendricks.
Defendant was interviewed two days after the incident, on May 21, but was not yet considered a suspect. He denied any involvement in the assault and said that, in addition to Roberts, Stevenson, and Clark, another individual named "John" was involved in the fight. He provided a physical description of that man as "a black male, eighteen to twenty, wearing a red shirt, green Army pants, and boots," but claimed to know nothing else about him. Actually, this description matched that given by the other participants, and Johnson as an eyewitness, of defendant's clothing. From the various physical and clothing descriptions given, police ultimately determined that defendant was the "John" who committed the stabbing. Defendant was arrested two weeks after the murder.
On October 23, 1997, Clark was arrested for his participation in this incident, while he was incarcerated in the Atlantic County jail for unrelated reasons. At the time of his arrest, Clark turned over to the Atlantic County Prosecutor's Office two letters he had received from defendant via another inmate. The first letter instructed Clark to sign the second letter and then send it to the prosecutor. The second letter was a statement that Roberts stabbed Hendricks, not defendant. Clark did not comply because he did not witness the stabbing.
Valerie Mack, a neighbor who witnessed the fight and worked with defendant's mother, testified for the defense. She testified that she saw defendant participate in the fight, but that at some point he was no longer involved and that another man made a "threatening motion" to the victim, after which the victim ran away. She could not remember what any of the men were wearing. In addition, she gave two statements to the police; the first was general and did not make mention of defendant because, she asserts, she both had not yet realized that it was he and did not want to get involved.
Defendant testified on his own behalf. He admitted that he was involved in a *253 fight with Hendricks, but did not have a knife in his possession at the time and did not stab Hendricks. Instead, he testified that Roberts stabbed Hendricks.
It is against this factual backdrop that we address defendant's arguments. Defendant, through counsel, raises the following issues:
I. THE DEFENDANT WAS DENIED HIS SIXTH AMENDMENT RIGHT TO CONFRONT THE WITNESSES AGAINST HIM WHEN THE PROSECUTOR HAD A DETECTIVE TESTIFY THAT "OTHER PEOPLE" HAD GIVEN POLICE DESCRIPTIONS OF THE STABBER WHICH FIT THE DEFENDANT. (Not Raised Below).
II. THE DEFENDANT'S RIGHT TO A FAIR TRIAL WAS VIOLATED WHEN THE PROSECUTOR WAS ALLOWED TO PRESENT A THREE MINUTE AND TEN SECOND VIDEOTAPE OF THE VICTIM'S AGONIZING DEATH BECAUSE IT CONTAINED A BRIEF DYING DECLARATION, EVEN THOUGH OTHER WITNESSES HAD ALREADY TESTIFIED ABOUT THAT STATEMENT.
III. IT WAS PLAIN ERROR FOR THE TRIAL COURT TO FAIL TO CHARGE THE JURY ON PASSION-PROVOCATION MANSLAUGHTER IN VIEW OF EVIDENCE THAT THE DEFENDANT AND THE VICTIM HAD BEEN ENGAGED IN AN ARGUMENT WHICH ESCALATED INTO A FIGHT; THAT THE VICTIM HAD PRETENDED TO HAVE A GUN; AND THAT THE VICTIM HAD ATTEMPTED TO STRIKE THE DEFENDANT WITH A BRANDY BOTTLE. (Not Raised Below).
IV. THE TRIAL COURT VIOLATED THE DEFENDANT'S SIXTH AND FOURTEENTH AMENDMENT RIGHT TO REPRESENT HIMSELF WHEN IT SUMMARILY DENIED HIS MOTION TO DISCHARGE HIS ATTORNEY WITHOUT AFFORDING HIM THE OPPORTUNITY TO KNOWINGLY AND INTELLIGENTLY WAIVE HIS RIGHT TO COUNSEL.
In addition, defendant, pro se, raises the following issues:
I. THE JURY INSTRUCTION GIVEN ON IDENTIFICATION WHERE THE TRIAL JUDGE REPEATEDLY REMINDED THE JURY TO RECALL THE WITNESSES PRESENTED BY THE STATE WHO HAD ALLEGEDLY IDENTIFIED DEFENDANT WITHOUT EVER MAKING REFERENCE TO THE OTHER STATE'S WITNESSES WHO COULD NOT IDENTIFY THE DEFENDANT WAS AN ERRONEOUS AND FLAWED JURY INSTRUCTION THAT DENIED DEFENDANT OF HIS 5th, 6th AND 14th AMENDMENT CONSTITUTIONAL RIGHTS AND THEREFORE REQUIRES A REVERSAL.
II. NUMEROUS INSTANCES OF THE INTRODUCTION OF HEARSAY STATEMENTS DENIED THE DEFENDANT HIS SIXTH AMENDMENT RIGHT TO CONFRONT AND CROSS-EXAMINE *254 WITNESSES AGAINST HIM.
III. THE PROSECUTOR'S IMPROPER QUESTIONING ON DEFENDANT'S RIGHT TO SILENCE AND WHY DEFENDANT DID NOT INFORM THE POLICE OF HIS ALIBI AND SIDE OF THE STORY WAS A VIOLATION OF THE DEFENDANT'S FIFTH AND FOURTEENTH AMENDMENT CONSTITUTIONAL RIGHTS AND REQUIRES REVERSAL.
Only the first three of the arguments advanced by counsel require extended discussion.

I.
We first consider whether it was plain error for the prosecutor to elicit testimony from Sergeant Burke concerning specific information that he received linking defendant as the person who stabbed Gregory Hendricks. Because defense counsel never objected to the hearsay statements, we must therefore apply the plain error rulethat is "error possessing a clear capacity to bring about an unjust result and which substantially prejudiced the defendant's fundamental right to have the jury fairly evaluate the merits of his defense." State v. Thornton, 38 N.J. 380, 396, 185 A.2d 9 (1962) (citations omitted), cert. denied, 374 U.S. 816, 83 S.Ct. 1710, 10 L.Ed.2d 1039 (1963). The testimony in question occurred during the following questioning of Sergeant Burke by the prosecutor:
Q: After that interview [referring to the interview of defendant on May 21] took place, were other people interviewed?
A: Yes.
Q: Did you review those interviews?
A: Some of them, yes.
Q: Did you, from the interviews, get a physical description, clothing description of the person who stabbed John Taylor?
A: Yes.
Q: I'm sorry, stabbed Gregory Hendricks, excuse me. Gregory Hendricks.
A: Yes.
Q: What was that?
A: It was a black male with braids or plats, about five six to five eight, eighteen to twenty, wearing green Army pants and a red shirt.
Q: From those other interviews, did you determine who it was who fit that description?
A: Yes.
Q: Who was that?
A: John Taylor.
Defendant contends that this evidence violated both the hearsay rule, N.J.R.E. 802, and his Sixth Amendment right of confrontation. We agree and further conclude that the impropriety is one clearly capable of producing an unjust result. See R. 2:10-2.
In State v. Bankston, 63 N.J. 263, 307 A.2d 65 (1973), our Supreme Court reaffirmed the well-settled rule that the right of confrontation is not violated when a police officer explains the reasons he apprehended a suspect or went to the scene of a crime, by stating that he did so "upon information received." Id. at 268, 307 A.2d 65. This type of general testimony is admissible to show that the officer was not acting arbitrarily. Ibid. On the other hand, when an officer becomes more specific by repeating what some other person told him concerning a crime by the accused, both the hearsay rule and the right of confrontation are violated. Ibid. The Court expanded the reach of the rule *255 beyond specific hearsay statements to those wherein only an impermissible inference of guilt is created. Id. at 271, 307 A.2d 65. The Court reasoned, "[w]hen the logical implication to be drawn from the testimony leads the jury to believe that a non-testifying witness has given the police evidence of the accused's guilt, the testimony should be disallowed as hearsay." Ibid.
"The principle distilled from Bankston and its progeny is that testimony relating inculpatory information supplied by a co-defendant or other non-testifying witness identifying the defendant as the perpetrator of a crime deprives the accused of his or her constitutional rights." State v. Farthing, 331 N.J.Super. 58, 75, 751 A.2d 123 (App.Div.), certif. denied, 165 N.J. 530, 760 A.2d 784 (2000). See also State v. Roach, 146 N.J. 208, 224-25, 680 A.2d 634, cert. denied, 519 U.S. 1021, 117 S.Ct. 540, 136 L.Ed.2d 424 (1996); State v. Irving, 114 N.J. 427, 446-47, 555 A.2d 575 (1989); State v. Alston, 312 N.J.Super. 102, 112-14, 711 A.2d 363 (App.Div.1998). As was the case in Bankston, here there was no allegation that the police acted arbitrarily in arresting or interrogating defendant, and therefore no need for any reference to the content of police interviews.
In fact, the hearsay testimony elicited in this case was much more damaging and direct in its potential for prejudice than in Bankston. There, a detective testified that, after receiving information from an informant, he sought a person fitting the informant's description who would have narcotics in his possession. The detective found that person in a bar and apprehended him. The inescapable inference, although never specifically repeated, was that an informant had told the officer that the defendant was committing a crime.
In this case, no such inference had to be drawn because there was direct testimony from Sergeant Burke as to "other peoples'" descriptions of Hendricks' stabber that led him to conclude it was defendant. Unlike the police officer in Bankston, who simply testified about receiving some general information from a non-testifying witness, see also State v. Roach, supra, 146 N.J. at 224-25, 680 A.2d 634; State v. Irving, supra, 114 N.J. at 445-47, 555 A.2d 575, here Sergeant Burke specifically repeated what various unidentified eyewitnesses had told the policethat the stabber was "a black male with braids or plats, about five six to five eight, eighteen to twenty, wearing green Army pants and a red shirt."
Moreover, it is obvious that the "other persons" to whom Sergeant Burke was referring as identifying the stabber were non-testifying witnesses. This is because Stevenson was the only witness at trial who actually identified defendant as the stabber and, even so, he had given his first two statements to the police before defendant's interview on May 21, after which time Burke said he received the other unidentified eyewitness accounts. Lewis Johnson, the fifteen-year-old playing basketball, spoke to Burke shortly after the incident and, in any event, never identified defendant at trial; he only described the clothing worn by the individual he observed swinging a knife. All other testifying witnesses swore they did not see the stabbing, including defendant's cohorts, Roberts and Clark, both of whom had strong motivation to blame defendant while exonerating themselves, as well as the victim's mother Bernice Livingston and cousin Tony Brody.
We conclude the error deprived defendant of his Sixth Amendment right of confrontation. We are also satisfied that, under the circumstances, the error complained *256 of was clearly capable of producing an unjust result. R. 2:10-2. See State v. Alston, supra, 312 N.J.Super. at 114-16, 711 A.2d 363.
We perceive no justification for elicitation of the offending testimony. Certainly, it was not to explain why the police approached defendant since defendant himself voluntarily appeared for questioning. Absent a legitimate excuse, it appears the only reason for the prosecutor's inquiry was to elicit accusations against defendant by non-testifying witnesses. As noted, the only testifying witness to identify defendant as the stabber was Stevenson. Defendant denied that he stabbed Hendricks and placed the blame on Roberts. His other so-called accomplices, including Roberts, claimed not to have seen the stabbing. And none of the remaining testifying eyewitnesses, except Johnson, claimed even to have seen defendant with a knife. In this context, it can not be said that the complained of error did not contribute to the verdict obtained.
In State v. Alston, supra, we had occasion to observe that there is "... very little that could be more prejudicial or more harmful than to admit an out-of-court declaration by an anonymous witness implicating defendant in the crime for which he stands trial which is not subjected to cross-examination...." 312 N.J.Super. at 114, 711 A.2d 363. See also State v. Thomas, 168 N.J.Super. 10, 13-16, 401 A.2d 693 (App.Div.1979) (although evidence was sufficient to support conviction, court was compelled to reverse because of prosecutor's misconduct, including a series of questions designed to establish that an unidentified informant had told the police that defendant was responsible for the crime). In this case, given the serious nature of the right infringed uponthe denial of the right of confrontationand the importance of the impermissible testimony in the overall presentation of the State's evidence, we think it evident that the aggregate effect of the error impacted on the fairness of the trial and was clearly capable of producing an unjust result.

II.
We also find error in the admission of a three minute and ten second surveillance videotape, submitted pursuant to N.J.R.E. 804(b)(2), when in fact only the final few seconds contained the victim's "dying declaration," the content of which had been attested to by at least three other witnesses. The probative value of such cumulative evidence was far exceeded by its prejudicial effect. See N.J.R.E. 403.
We have viewed the videotape. See R. 1:2-3. Suffice it to say, it is of obvious dramatic effect, depicting, as it does, the last minutes of the victim's life. Hendricks is visible throughout most of the black-and-white tape. It begins with Hendricks slumped over the grocery store counter and then falling backward onto the floor, momentarily out of the camera's view. In the meantime people are walking in and out of the store. One person says "he gonna die, man," while another is calling the police on a cell phone, advising "he's dying" and "he is in very bad condition." Hendricks struggles to stand up, but is unable to do so or to respond to questions about the stabbing, other than to say "ambulance, I'm dying." Eventually, the victim's mother enters the store, obviously distraught and screaming. At the same time, a police officer arrives and, together with Ms. Livingston, asks Hendricks who stabbed him. At first not responding and then at his mother's frantic urging, Hendricks, in a barely audible whisper, replies "Johnny."
The prosecutor even acknowledged the videotape to be "compelling," and the trial judge observed that the tape is "graphic" *257 in depicting defendant "in the throes of death." Apparently, one or two jurors were moved to tears. And lest any of them forget the impression made during the State's case-in-chief, the tape was again played for the jurors in summation when the prosecutor, in her closing remarks, reminded them that they would "hear [Gregory Hendricks'] suffering" and how he was "no longer responding to anyone."
No less than three eyewitnesses testified to the victim's dying declaration. The State's first two witnesses, the responding police officers, both testified that, when asked who did this, Gregory Hendricks responded, "Johnny" or "John." The third witness, Farub Khan, the owner of the store who was present throughout the recorded ordeal, authenticated the videotape and it was then played for the jury. Shortly thereafter, the victim's mother, Bernice Livingston, also testified that she asked her dying son to tell the police who had done this to him, and he responded, "Johnny." Immediately afterwards, Ms. Livingston was given "a minute to compose herself."
There is no dispute that the victim's words were admissible as a dying declaration, N.J.R.E. 804(b)(2), and indeed the defense did not object to testimony from the police officers and Ms. Livingston that the victim had identified "Johnny" as the stabber. In view of the availability of this testimonial evidence to prove the same point, the probative value of the tape's last few seconds containing the dying declaration is greatly diminished as it becomes merely cumulative and redundant. See R. Biunno, New Jersey Rules of Evidence, comment 3 on N.J.R.E. 403 (Gann 2000). See also Old Chief v. United States, 519 U.S. 172, 184-85, 117 S.Ct. 644, 652, 136 L. Ed.2d 574, 590 (1997) (in considering probative value under Fed.R.Evid. 403, courts should consider "evidentiary alternatives").
On the other hand, the potentially prejudicial effect of observing the victim struggling for life is enormous and substantially outweighs whatever residual or collateral evidential value there remained to the tape's depiction of defendant's last words. See State v. Johnson, 120 N.J. 263, 296-98, 576 A.2d 834 (1990) (where medical examiner had already testified about cause of death and extent of injuries to the victims, the introduction of forty-six photographs of the victims' bodies covered with blood "created a substantial danger of undue prejudice to defendant"); State v. Walker, 33 N.J. 580, 596, 166 A.2d 567 (1960) (where cause of death was uncontested, the relevance of photographs of the victim's brain "was substantially outweighed by their inflammatory nature"); State v. Jordan, 197 N.J.Super. 489, 497-98, 504, 485 A.2d 323 (App.Div.1984) (holding that defendants' objections to an "inflammatory" photographshowing victim on his back, post-autopsy, stitched from shoulder to groinshould have been sustained where the photograph was not probative of any fact in issue inasmuch as the victim had been shot once in the back). To compound the prejudice, the other three minutes of the tape played for the jury lacked any intrinsic relevance whatsoever; the dramatic effect of this portion of the tape could only have further inflamed the jury's passion. Under the circumstances, we conclude that the playing of the videotape twice for the jury deprived defendant of a fair trial.

III.
We also find plain error in the trial court's failure, sua sponte, to charge the jury on passion-provocation manslaughter.
Where, as here, no request has been made for the instruction, the court is *258 nevertheless obliged to charge it if it is "clearly indicated" in the record. State v. Robinson, 136 N.J. 476, 489, 643 A.2d 591 (1994); State v. Choice, 98 N.J. 295, 299, 486 A.2d 833 (1985); State v. Powell, 84 N.J. 305, 318-19, 419 A.2d 406 (1980). Even if it is contrary to defendant's trial strategy, a trial court "ordinarily has a supervening responsibility to charge the jury concerning any version of the offense `clearly indicate[d]' by the evidence...." State v. Grunow, 102 N.J. 133, 148, 506 A.2d 708 (1986). See also State v. Robinson, supra, 136 N.J. at 490, 643 A.2d 591; State v. Purnell, 126 N.J. 518, 540-41, 601 A.2d 175 (1992), habeas corpus denied, Purnell v. Hendricks, No. 99-1651JEI, 2000 WL 1523144 (D.N.J. Oct.16, 2000); State v. Powell, 84 N.J. at 317, 419 A.2d 406. In determining whether to instruct a jury on passion-provocation, the judge must consider the evidence in the light most favorable to the defendant. State v. Mauricio, 117 N.J. 402, 412, 568 A.2d 879 (1990).
Passion-provocation manslaughter is a lesser-included offense of murder. State v. Robinson, supra, 136 N.J. at 482, 643 A.2d 591; State v. Sloane, 111 N.J. 293, 300, 544 A.2d 826 (1988). It is a purposeful or knowing killing that "is committed in the heat of passion resulting from a reasonable provocation." N.J.S.A. 2C:11-4b(2). Where the record contains evidence of passion-provocation, the State must prove beyond a reasonable doubt, in order to obtain a conviction for murder, that the purposeful killing was not the product of passion-provocation. State v. Heslop, 135 N.J. 318, 324-25, 639 A.2d 1100 (1994). "[M]itigation of homicide because of passion/provocation is ordinarily a question for the jury, unless the evidence is so weak as to preclude jury consideration." State v. Crisantos (Arriagas), 102 N.J. 265, 275, 508 A.2d 167 (1986).
Passion-provocation manslaughter has four elements:
[1] the provocation must be adequate; [2] the defendant must not have had time to cool off between the provocation and the slaying; [3] the provocation must have actually impassioned the defendant; and [4] the defendant must not have actually cooled off before the slaying.
State v. Mauricio, supra, 117 N.J. at 411, 568 A.2d 879. The first two criteria are objective; the second two are subjective. Ibid. If the trial court finds that the first two elements are clearly indicated by the evidence, it should instruct the jury on passion-provocation and allow the jurors to decide if the second two subjective elements have been established. State v. Robinson, supra, 136 N.J. at 491, 643 A.2d 591; State v. Mauricio, supra, 117 N.J. at 415, 568 A.2d 879.
For provocation to be adequate, it "must be `sufficient to arouse the passions of an ordinary [person] beyond the power of his [or her] control.'" State v. Robinson, supra, 136 N.J. at 491, 643 A.2d 591 (quoting State v. Mauricio, supra, 117 N.J. at 412, 568 A.2d 879.). On this score, it has been held "that a threat with a gun or knife might constitute adequate provocation." State v. Mauricio, supra, 117 N.J. at 414, 568 A.2d 879. See State v. Pasterick, 285 N.J.Super. 607, 614, 667 A.2d 1103 (App.Div.1995). See also State v. Powell, supra, 84 N.J. at 321-22, 419 A.2d 406 (defendant's statement that the victim had attempted to wrestle the defendant's gun away from him during an argument sufficiently established adequate provocation, even though the defendant had previously given a different story to the authorities); State v. Bonano, 59 N.J. 515, 523-24, 284 A.2d 345 (1971) (although the verbal threat alone would not be sufficient to reduce the degree of the *259 crime, the menacing gesture with the weapon could properly be considered adequate provocation); State v. Blanks, 313 N.J.Super. 55, 72, 712 A.2d 698 (App.Div. 1998) (the record revealed that a long-handled cooking fork was found on the kitchen floor at the victim's side, suggesting that the victim may have brandished the fork and further provoked defendant); State v. Vigilante, 257 N.J.Super. 296, 301-02, 305-06, 608 A.2d 425 (App.Div. 1992) (prior history of abuse, threats to kill, and fact that victim "bent down to pick up a pipe wrench" all indicated presence of reasonable provocation); State v. Pridgen, 245 N.J.Super. 239, 242-43, 247-48, 584 A.2d 869 (App.Div.), certif. denied, 126 N.J. 327, 598 A.2d 886 (1991).
Applying these principles to the case at hand, we find that several versions of the incident clearly indicate the possibility of the finding of passion. By most accounts, the encounter started as a verbal confrontation over Hendricks' alleged slapping of defendant's girlfriendand expectant mother of his childthe day before and only escalated into a physical confrontation after Hendricks apparently pretended to reach for a gun and actually came out of the car brandishing a bottle. Although by other accounts defendant came into the melee armed with a knife concealed in his waistband, his accomplices purportedly believed the fight nevertheless would be fair and, in fact, Hendricks was the first to resort, visibly, to a weapon. In fact, by at least one account, Hendricks used the bottle to hit Roberts in the face, and then was swinging it around during the fight "about to go for defendant's head." By another account, it was not until the fight was in full mode that defendant took out the knife and stabbed the victim one time in the chest.
We are satisfied that a version, or combination of versions, of the evidence, considered in the light most favorable to defendant, clearly indicates that a jury could rationally conclude that a reasonable person might, under the circumstances, have reasonably been provoked to the point of loss of control. In this regard, we need not consider whether defendant "started" the verbal confrontation since, by the time the altercation became physical, defendant was not the only one armed. Cf. State v. Crisantos, supra, 102 N.J. at 274-75, 508 A.2d 167. In any event, "the issue here is whether a reasonable person would have been provoked, not whether a reasonable person would have engaged in conduct that incited the alleged provocation." State v. Mauricio, supra, 117 N.J. at 415, 568 A.2d 879.
Nor can we say as a matter of law that the time period was such that no jury could rationally determine that a reasonable person's inflamed passions might not have cooled sufficiently to permit the return of self-control. Ibid. State v. Lawton, 298 N.J.Super. 27, 33, 688 A.2d 1096 (App. Div.), certif. denied, 151 N.J. 72, 697 A.2d 545 (1997). The trial court should have left that question as well to the jury to appraise in light of all the surrounding circumstances. And if the two objective criteria were satisfied, then we see nothing in the case to foreclose jury consideration of the subjective elements, namely whether the provocation in fact aroused the passions of this defendant, and whether his stabbing of the victim occurred before he had regained his composure. We thus conclude that the trial court's failure to instruct, sua sponte, on passion-provocation manslaughter was reversible error.

IV.
The sole remaining issue raised by counsel ascribes error to the trial court's alleged denial of defendant's Sixth Amendment right to self-representation. See *260 Faretta v. California, 422 U.S. 806, 835-36, 95 S.Ct. 2525, 2541, 45 L.Ed.2d 562, 581-82 (1975); State v. Crisafi, 128 N.J. 499, 509, 608 A.2d 317 (1992). Because our disposition of the three other issues raised by counsel fully vindicates defendant's rights, we need not determine whether the alleged constitutional deprivation actually occurred. We simply note in passing that the record does not demonstrate that defendant clearly and unequivocally asked to proceed pro se. See, e.g., State v. Ortisi, 308 N.J.Super. 573, 587-90, 706 A.2d 300 (App.Div.), certif. denied, 156 N.J. 383, 718 A.2d 1212 (1998). Instead, defendant's motion sought the discharge of his attorney and, from the ensuing colloquy with the court, the assistance of substitute counsel. Nevertheless defendant's pro se motion cited Faretta and, from his discussion on the record with defendant, even the trial judge seemed to have interpreted it to include an alternative request to proceed pro se. Although trial courts indulge every reasonable presumption against waiver of counsel and are discouraged from broaching the subject absent an explicit request from the defendant, where, as here, sufficient enough ambiguity exists for the court itself to have raised the very issue only to then have rejected it out-of-hand, we deem the proper course to be to seek clarification from defendant. If, as a result, an affirmative, express request to proceed pro se is made, the court must then determine whether defendant has made a knowing waiver of his right to counsel. State v. Crisafi, supra, 128 N.J. at 510-12, 608 A.2d 317.

V.
None of the issues raised by defendant pro se are of sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2). However, we are satisfied that each of the errors we have described was capable of producing an unjust result with respect to defendant's convictions for purposeful and knowing murder as well as all the convictions merged therein. Even if, however, none of them independently was sufficient to upset these convictions, certainly their cumulative effect was to deprive defendant of a fair trial. See State v. Orecchio, 16 N.J. 125, 129, 106 A.2d 541 (1954). We are equally convinced that two of these errorsthe Bankston violation and the admission of the videotapetainted the remaining conviction for obstruction of justice so as to require its vacation.
The judgment of conviction is reversed, and we remand for a new trial.
NOTES
[1] Defendant was indicted along with Kevin Stevenson, Dwayne Roberts, Margenese Bell, and Denise Thomas. Eventually all of the co-defendants either pled guilty to reduced charges, or had the charges against them dismissed. Defendant was tried alone for the murder charge and the related lesser offenses.
[2] Defendant was convicted of third-degree unlawful possession of a handgun under a previous indictment.