**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0486-20

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

B.A.W.,[1]

     Defendant-Appellant.

_____

Argued November 14, 2023 – Decided January 9, 2024

Before Judges Rose, Smith and Perez Friscia.

On appeal from the Superior Court of New Jersey, Law Division, Camden County, Indictment No. 19-07-1865.

Alyssa A. Aiello, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Alyssa A. Aiello, of counsel and on the brief).

Kevin Jay Hein, Assistant Prosecutor, argued the cause for respondent (Grace C. Mac Aulay, Camden County

---

[1] We use initials and pseudonyms to protect the privacy of the victim. See R. 1:38-3(c)(12).

Prosecutor, attorney; Kevin Jay Hein, of counsel and on the brief).

PER CURIAM

Following a trifurcated trial, the same jury convicted defendant of various offenses for attempting to kill his estranged wife, F.R. (Faith), on the night of November 4, 2018; stalking her in the weeks leading up to the shooting; and possessing a weapon by a convicted felon. During the first trial, the State presented evidence that Faith was shot multiple times as she and her friend, S.W. (Steve), left his gated apartment complex in Cherry Hill. The State's theory was that defendant followed Faith to Steve's residence, laid in wait, shot Faith in a jealous rage, and fled to Florida.

Married in 2011 when Faith was twenty-two years old and defendant forty-six; they share two children. In 2017, Faith and the children moved into her father's home in response to defendant's controlling and possessive behavior. About six weeks before the incident, defendant's alarming conduct escalated: he peered at Faith through windows; made unwanted calls and text messages; and accused Faith of cheating on him. Faith caught defendant following her to and from work, social gatherings, and errands. As one notable example, on October 18, 2018, defendant followed Faith to a wineshop in his Honda Civic, prompting

2

Faith to call the police. Defendant called Faith while she was speaking with the officer. Faith testified she "was living in fear all the time."

The evening of the incident was the third time Faith socialized with Steve outside the store, where she worked and he often shopped, and the first time she was inside his apartment. Faith arrived at 8:30 p.m. and had a few drinks but did not feel inebriated. Fearing defendant had followed her, Faith looked out the window several times and told Steve about her concerns.

Around 11:30 p.m., Steve walked Faith to her car. Before he could open the door, a man with a gun jumped out from behind the car. Faith immediately recognized defendant as the gunman. She watched as he loaded the cylinder of the gun while pointing it in her direction. Steve tackled defendant to the ground; they wrestled; defendant freed himself; and Faith and Steve ran in two different directions. At some point, defendant caught up with Faith and shot her in the face. Faith heard six shots; she was shot three times.

Steve heard the shots and called 9-1-1. He saw Faith run to the front of the apartment building and pulled her inside. Faith told Steve: "That was [B.A.W.]. That was [B.A.W.]."

Police arrived within minutes of the shooting and found Faith and Steve in the apartment building's lobby bathroom. Writhing in pain, Faith immediately

A-0486-20

identified defendant as the shooter. At trial, the State played video footage from body worn cameras (BWC) of two responding officers. Totaling more than twenty minutes in length, the BWC footage graphically depicted Faith's injuries and captured various statements made by Faith and echoed by police that defendant was the shooter. The State elicited testimony concerning Faith's identification of defendant from her, Steve, and the responding officers. Faith maintained she was certain her husband shot her with a revolver and that he had driven a "black jeep-like car" to the scene. There were no eyewitnesses to the shooting but Steve's neighbors saw a jeep-type SUV leaving the scene.

No weapon was recovered at the scene. Police found one shell casing which, defendant's expert later testified, was "highly likely" to have been discharged from a "semi-automatic firearm." The State did not introduce any phone records or evidence that defendant owned or had access to a jeep vehicle. A local detective testified defendant was arrested in Florida about one month after the incident. Defendant did not testify but argued that this was a case of misidentification.

Following the first trial, defendant was convicted of counts one through seven charged in a nine-count Camden County indictment: first-degree attempted murder, N.J.S.A. 2C:5-1 and :11-3(a)(1) (count one); third-degree

4

aggravated assault with a revolver-style handgun, N.J.S.A. 2C:12-1(b)(2) (count two); third-degree aggravated assault on a domestic violence victim, N.J.S.A. 2C:12-1(b)(12) (count three); fourth-degree aggravated assault by pointing a firearm, N.J.S.A. 2C:12-1(b)(4) (count four); fourth-degree stalking, N.J.S.A. 2C:12-10(b) (count five);[2] second-degree unlawful possession of a revolver-style handgun, N.J.S.A. 2C:39-5(b) (count six); and second-degree possession of a revolver-style handgun for unlawful purpose, N.J.S.A. 2C:39-4(a) (count seven). After the second trial, the jury found defendant not guilty of fourth-degree criminal contempt by violating a TRO, N.J.S.A. 2C:29-9(b) (count eight). At the conclusion of the third trial, the jury found defendant guilty of second-degree certain persons not to have weapons, N.J.S.A. 2C:39-7(b)(1) (count nine).

After denying defendant's motion for a new trial, granting the State's motion for a discretionary extended term as a persistent offender, N.J.S.A.

---

[2] The indictment charged defendant with third degree stalking in violation of a temporary restraining order (TRO), N.J.S.A. 2C:12-10(c). Because the stalking count referenced the TRO, in the first trial, the jury only was asked to consider whether defendant was guilty of fourth-degree stalking. When asked to consider whether defendant committed stalking in violation of a TRO, in the second trial, the jury answered "no." The parties agreed to a trifurcated trial to insulate the jury from hearing evidence of Faith's TRO, relevant to counts five and eight; and defendant's prior aggravated assault conviction, relevant to count nine.

2C:44-3(a), and ordering the appropriate mergers, the trial court sentenced defendant to an aggregate thirty-eight-and-one-half-year prison term, with a thirty-and-one-half-year period of parole ineligibility. Specifically, the court imposed the following prison terms on the remaining counts: thirty years, subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2 on count one; eighteen months on count five, consecutively to counts one, six, and nine; seven years with a forty-two-month parole disqualifier on count six, consecutively to counts one and five, and concurrently to count nine; and seven years with a five-year mandatory parole ineligibility period pursuant to N.J.S.A. 2C:39-7(b)(1) on count nine, consecutively to counts one and five and concurrently to count six.[3]

Defendant appeals raising the following points for our consideration:

POINT I

THE TRIAL COURT ERRED BY ADMITTING THE VICTIM'S HEARSAY STATEMENTS NAMING DEFENDANT AS THE SHOOTER, WHICH WERE CONTAINED IN HIGHLY PREJUDICIAL [BWC] RECORDINGS. THE COURT FURTHER ERRED BY ALLOWING THE [BWC] FOOTAGE TO BE PLAYED BEFORE THE JURY, BECAUSE, AS [DEFENDANT] ARGUED BELOW, THE VISUAL

---

[3] Pursuant to the parties' negotiated plea agreement, defendant also was sentenced to a concurrent prison term of eighteen months for fourth-degree resisting arrest, charged in a separate indictment.

A-0486-20

IMAGE OF THE BLEEDING VICTIM WRITHING IN PAIN HAD NO PURPOSE OTHER THAN TO INFLAME THE PASSIONS OF THE JURY. MOREOVER, THE [BWC] RECORDINGS, WHICH SPANNED MORE THAN [TWENTY-FIVE] TRANSCRIPT PAGES, CONTAINED NUMEROUS OTHER STATEMENTS THAT WERE IRRELEVANT AND PREJUDICIAL.
[(Partially raised below)]

POINT II

THE TRIAL COURT ERRED IN CHARGING THE JURY ON FLIGHT BECAUSE [DEFENDANT]'S PRESENCE IN FLORIDA, MORE THAN A MONTH AFTER THE SHOOTING, DID NOT REASONABLY JUSTIFY AN INFERENCE THAT [DEFENDANT] LEFT NEW JERSEY WITH A CONSCIOUSNESS OF GUILT AND TO AVOID ARREST.

POINT III

IMPROPER COMMENTS MADE BY THE PROSECUTOR IN SUMMATION REQUIRE REVERSAL.
(Partially raised below)

POINT IV

THE TRIAL COURT ERRED BY IMPOSING THREE CONSECUTIVE SENTENCES WITHOUT CONSIDERING THE OVERALL FAIRNESS OF THE SENTENCE.

Having considered defendant's challenges to his convictions in view of the totality of the evidence presented at trial, we are satisfied any trial errors

7

were not "clearly capable of producing an unjust result." See R. 2:10-2. Although we are satisfied that the court's imposition of consecutive sentences conformed with the factors enumerated by our Supreme Court in State v. Yarbough, 100 N.J. 627 (1985), we nonetheless remand for an overall statement of fairness pursuant to State v. Torres, 246 N.J. 246 (2021), decided the year after defendant was sentenced. We therefore affirm defendant's convictions and remand for resentencing.

I.

In his first point on appeal, defendant raises various overlapping arguments concerning the trial court's admission of Faith's identification through the testimony of the responding officers and, again, when their BWC footage was played for the jury. He further contends the admission of the video portions of the BWC footage was highly prejudicial because they depicted images of Faith, bleeding in obvious pain. For the first time on appeal, defendant argues the BWC audio contains other irrelevant and highly prejudicial statements.

We address defendant's contentions in light of our discretionary standard of review of the trial court's evidentiary rulings. See State v. Garcia, 245 N.J. 412, 430 (2021). Accordingly, we do "not substitute our judgment unless the evidentiary ruling is 'so wide of the mark' that it constitutes 'a clear error in

judgment.'" Ibid. (quoting See State v. Medina, 242 N.J. 397, 412 (2020)). "Every mistaken evidentiary ruling, however, will not lead to a reversal of a conviction. Only those that have the clear capacity to cause an unjust result will do so." Ibid. (first citing State v. Prall, 231 N.J. 567, 581 (2018); and then citing R. 2:10-2). We address those claims that were not raised before the trial court through the prism of the plain error standard. R. 2:10-2 (providing, in pertinent part, "the appellate court may, in the interests of justice, notice plain error not brought to the attention of the trial . . . court" but shall disregard any error unless it was "clearly capable of producing an unjust result").

To give context to the court's admission of Faith's identification, we briefly summarize the pertinent procedural history underpinning the State's intention to admit the footage from the BWCs of Cherry Hill Police Officers Sean Fay and Jordan Mayr.

On the State's pretrial application, the court conducted a Driver[4] hearing regarding the admissibility of the BWC footage. At the outset of the hearing, the State acknowledged its obligation to redact all references to Faith's

---

[4] State v. Driver, 38 N.J. 255 (1962). Following a Driver hearing, the trial court determines whether a sound recording is admissible, considering several factors including whether any changes, additions, or deletions have been made to the recording. Id. at 287.

restraining order. While the videos were played in open court, the parties agreed to certain other redactions, and the court sustained defendant's objection to additional statements. For example, the court excluded Steve's remarks that Faith had told him she feared defendant as "hearsay within hearsay" and "overly prejudicial." Defendant did not, however, object to Faith's identification of defendant or any other statements as hearsay.

During her opening statement, the prosecutor told the jury: "You're gonna see body worn camera footage which, I have to warn you, is somewhat graphic and may be a little disconcerting." Defendant posed no objection to the prosecutor's remark.

At trial, Fay testified when he first encountered Faith in the lobby bathroom, "she was in a distraught state and seemed very . . . panicked." Fay observed Faith bleeding in and around her mouth. "She was crying to a degree. She was in agonizing pain it appeared." Fay described Faith's demeanor as "frantic." Over defendant's objections, the following exchange ensued:

> PROSECUTOR: What did she say about how she sustained these injuries?
>
> FAY: She said she was shot.
>
> PROSECUTOR: Did she say who shot her?
>
> FAY: Yes.

PROSECUTOR: And who was that?

FAY: She said, "[B.A.W.]"

Thereafter, the State moved into evidence Fay's BWC video footage. At sidebar, apparently for the first time at trial, defendant objected to the video portion, contending it "offer[ed] no probative value at all." The State countered that the court had held "a preliminary hearing about this matter" and "ruled that [the video] was admissible" as "highly probative because it shows the moment after the shooting occurred when [Faith identified defendant]."[5] The prosecutor argued the video provided a basis for the jury "to assess th[e] credibility of [Faith] making the identification"; all prejudicial portions of the video were redacted; and the footage "corroborate[d] the witness's testimony." Contending the prosecutor's argument "c[ould] be satisfied with the audio," defendant explicitly limited his objection to the "video portion" of the BWC footage and stated he had "no objection to the audio." The parties then disputed whether the injuries depicted in the video were relevant to the elements of the charges. The court overruled the objection based on the "victim's identification."

---

[5] The court's decision on the admissibility of the videos is not contained in the record provided on appeal. According to defendant's case information statement, no inquiry was made of the trial court as to "whether the judge w[ould] be filing a statement or opinion pursuant to R[ule] 2:5-1(b)."

Similarly, the State introduced Faith's identification of defendant through Mayr's testimony and BWC footage. Mayr arrived at the scene after Fay, observed Faith on the bathroom floor "bloody and . . . screaming and writhing in pain."

Within five to ten minutes of Mayr's arrival, EMS arrived and placed Faith in the ambulance, where they attempted to stabilize her. Mayr accompanied Faith in the ambulance. When asked to describe her condition, Mayr testified: "She's screaming. She's telling EMTs and myself that he tried to kill me, he tried to kill me. I can see blood from her mouth and her chest. She kept saying over and over again." The responding EMT later testified "it looked like [Faith] was in the beginning stages of shock." Over defendant's objection, Mayr testified he asked Faith who tried to kill her and Faith responded, "[B.A.W.]," who "was her ex-husband." During his ensuing testimony the State played Mayr's BWC footage, subject to the same objection previously raised by defendant regarding the introduction of Fay's BWC footage.

In summation, the State played both BWC videos. The prosecutor argued the footage demonstrated Faith did not sound confused about who shot her. Pertinent to this appeal, at the conclusion of the prosecutor's closing statement defendant objected to the prosecutor's comments, "Does she look confused?";

12

and "Why would she lie?" as attempts to bolster Faith's credibility. The court indicated it would instruct the jury "if anything that counsel said was in conflict with [its] instruction to . . . ignore them or to . . . listen to [its] instructions only."

## A. Faith's Identification of Defendant

We first address defendant's contention that the trial court erroneously admitted Faith's statements identifying defendant as the shooter through the testimony of Officers Fay and Mayr. The State maintains the statements were properly admitted as excited utterances under N.J.R.E. 803(c)(2), and prior identification under N.J.R.E. 803(a)(3). The trial court did not provide a basis for overruling defendant's objections.

N.J.R.E. 801 defines hearsay as "a statement other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." N.J.R.E. 801(c). Hearsay may not be admitted into evidence unless it falls within one of the exceptions provided by the rules of evidence or "other law." N.J.R.E. 802.

### 1. Excited Utterances

The excited utterance exception to the hearsay rule permits the admission of a statement "relating to a startling event or condition made while the declarant

was under the stress of excitement caused by the event or condition and without opportunity to deliberate or fabricate." N.J.R.E. 803(c)(2). The rationale for the excited utterance exception is that "excitement suspends the declarant's powers of reflection and fabrication, consequently minimizing the possibility that the utterance will be influenced by self-interest and therefore rendered unreliable." State v. Cotto, 182 N.J. 316, 328 (2005) (quoting State v. Long, 173 N.J. 138, 158 (2002)).

In deciding "whether there was an opportunity to fabricate or deliberate, a court should consider 'the element of time, the circumstances of the incident, the mental and physical condition of the declarant, and the nature of the utterance.'" Long, 173 N.J. at 159 (quoting State v. Williams, 106 N.J. Super. 170, 172 (App. Div. 1969)). Although each factor is important, "the crucial element is the presence of a continuing state of excitement." Cotto, 182 N.J. at 328 (quoting State v. Lyle, 73 N.J. 403, 413 (1977)). "[A] statement constitutes an excited utterance when 'the circumstances reasonably warrant the inference that the statement was made as an uncontrolled response to the shock of the event before reasoned reflection could have stimulated a self-serving response.'" Ibid. (quoting Cestero v. Ferrara, 57 N.J. 497, 504 (1971)).

Defendant renews his objection that Faith's statements to Fay and Mayr did not fall within the excited utterance exception. In his merits brief, defendant argues unlike her statement to Steve, which was "made spontaneously . . . immediately after they reached the safety of the lobby bathroom," Faith's statements to the officers were made after she "had time to reflect on the shooting and her belief that [defendant] committed it." Citing the Supreme Court's decision in Cotto, defendant argues Faith's statements to Fay and Mayr, naming defendant as the shooter, were not "not sufficiently spontaneous to assure reliability." Defendant's contentions are misplaced.

In Cotto, the Court held the exception inapplicable where two sisters, who had witnessed a residential robbery, gave statements to police at the crime-scene apartment about fifteen to twenty minutes after the robbery and at the police station about thirty to forty minutes after the robbery. 182 N.J. at 329-30. The Court reasoned the statements were made at the apartment after the witnesses "had an opportunity to deliberate." Id. at 330. Similarly, the statements given at police headquarters were made after "a cooling-off period during which the sisters achieved some physical and emotional distance from the robbery." Id. at 329. Thus, "the sisters would have had an opportunity to calm themselves and

provide thoughtful answers to the questions the police posed during the formal interview at the station." Ibid.

The Court nonetheless deemed harmless the admission of the witnesses' statements through the trial testimony of the police officers. Id. at 331. The Court cited the witnesses' previous in-court identification of the defendant; the prior romantic relationship between one witness and defendant; and defendant's opportunity to cross-examine the sisters at trial.

In the present matter, Faith was in the "the presence of a continuing state of excitement" when she told Fay "[B.A.W.]" shot her. See id. at 328. Indeed, in his merits brief, defendant acknowledges Faith, who had suffered multiple gunshot wounds just moments before, was "clearly distraught from the obvious pain she was in" when she made the statement to Fay and a significant amount of time had not passed since the shooting. Notably, Faith made the statement to Fay on the heels of her statement identifying the shooter to Steve, which defendant acknowledges "had all the hallmarks of an exited utterance."

Nor are we persuaded that the court erroneously admitted Mayr's testimony concerning Faith's identification of defendant. Although Faith made the statement approximately fifteen minutes after the shooting, she was still in "the presence of a continuing state of excitement." Unlike the time frame in

16

Cotto, where the thirty to forty-five-minute interlude provided the witnesses with a "cooling-off period during which [they] achieved some physical and emotional distance" from the crime, Faith was still in the throes of agony when she told Mayr "[B.A.W.]" shot her. See id. at 329. Her body was in the beginning stages of shock, and she reasonably believed she was dying. The fifteen minutes between the shooting and her statements to Mayr thus did not provide Faith with a period of "calm" and opportunity for "reasoned reflection" indicative of a statement falling outside the purview of an excited utterance. See id. at 328-29.

We further reject defendant's contention that Faith's identification of defendant fails to satisfy the excited utterance exception because it was made in response to police questioning. As the Court observed in Cotto, "a response to a question may constitute an excited utterance," but in that case, "the sisters would have had an opportunity to calm themselves and provide thoughtful answers to the questions the police posed during the formal interview at the station." Id. at 329. No such cooling off period occurred here.

Even if Faith's statements were erroneously admitted under the excited utterance exception to the hearsay rule, we conclude any error was harmless.

17

Faith knew her assailant, having been married to defendant for about eight years; testified at trial; and identified him in court at the time of trial. See id. at 331.

## 2. Prior Identification

Because we conclude Faith's identification of defendant was properly admitted as excited utterances, we need not reach the State's alternate argument. We do so for the sake of completeness.

A declarant-witness's statement that is a "prior identification of a person made after perceiving that person if made in circumstances precluding unfairness or unreliability" is admissible as a hearsay exception if the declarant witness testifies and is subject to cross-examination. N.J.R.E. 803(a)(3). The rationale for admitting a prior identification is that "it is likely to be correct since it was made when the events and sensory impressions were fresh in the mind of the one making the identification." Biunno, Weissbard & Zegas, Current N.J. Rules of Evidence, cmt. 3 on N.J.R.E. 803 (2023-2024) (citing State v. Matlack, 49 N.J. 491, 498 (1967)) (explaining the similarity between Rule 63(1)(c) (1967) and N.J.R.E. 803(a)(3)).

Faith made the identifying statements no more than fifteen minutes after she was shot. She testified about her opportunity to observe defendant in the "lit" parking lot during the attack and that the alcohol did not affect her ability

18

to identify him as the shooter. Further, there is no indication in the record, nor has defendant argued, that the procedure under which Faith made the identifications was "inherently suggestive" or otherwise unsuitable for submission to a jury. State v. Henderson, 208 N.J. 208 (2011). Accordingly, Faith's statement to police that the shooter was "[B.A.W.]" was admissible as a "prior identification."

### B. Prejudicial BWC Footage

We turn to defendant's argument that the trial court committed reversible error in admitting the BWC recordings because the prejudicial effect of their combined twenty-minute footage, including "disturbing images" of Faith, substantially outweighed their probative value. Defendant renews his argument that the BWC footage was cumulative because the officers and Steve testified at trial that Faith had identified defendant as the shooter. He further contends the prosecutor's remarks in summation concerning Faith's several statements identifying defendant exacerbated the BWC recordings' prejudicial impact. In addition, defendant belatedly claims the BWC footage contained overwhelmingly prejudicial remarks, including, "the dramatic sounds of [Faith] crying that she wanted to die"; "[Steve] telling [Faith] he loves her"; "officers and EMTs describing [Faith]'s injuries"; the officers' repeated statements

defendant was the suspect; and "[Faith] repeatedly saying the name of a 'federal agent,' who 'knows everything.'"

"'Evidence must be relevant for it to be admissible,' and 'all relevant evidence is admissible' unless excluded by the Rules of Evidence or other law." State v. Williams, 240 N.J. 225, 235 (2019) (first quoting State v. Scharf, 225 N.J. 547, 568 (2016); and then quoting N.J.R.E. 402). "Evidence is relevant if it has 'a tendency in reason to prove or disprove any fact of consequence to the determination of the action.'" Ibid. (quoting N.J.R.E. 401). The evidence must be probative of a fact that is "really in issue in the case," as determined by reference to the applicable substantive law. State v. Buckley, 216 N.J. 249, 261 (2013) (quoting State v. Hutchins, 241 N.J. Super. 353, 359 (App. Div. 1990)).

Under N.J.R.E. 401, "[e]vidence need not be dispositive or even strongly probative in order to clear the relevancy bar." Buckley, 216 N.J. at 261. Moreover, "[t]he proponent need not demonstrate that the evidence can, in and of itself, establish or disprove a fact of consequence in order to meet the benchmark of N.J.R.E. 401." State v. Cole, 229 N.J. 430, 448 (2017). "Once a logical relevancy can be found to bridge the evidence offered and a consequential issue in the case, the evidence is admissible, unless exclusion is

warranted under a specific evidence rule."  State v. Burr, 195 N.J. 119, 127 (2008); see N.J.R.E. 402.

N.J.R.E. 403 "mandates the exclusion of evidence that is otherwise admissible 'if its probative value is substantially outweighed by the risk of (a) undue prejudice, confusion of issues, or misleading the jury or (b) undue delay, waste of time, or needless presentation of cumulative evidence.'" Cole, 229 N.J. at 448 (quoting N.J.R.E. 403).  "The party urging the exclusion of evidence under N.J.R.E. 403 retains the burden 'to convince the court that the N.J.R.E. 403 considerations should control.'"  State v. Santamaria, 236 N.J. 390, 406 (2019) (quoting Rosenblit v. Zimmerman, 166 N.J. 391, 410 (2001)).

To determine undue prejudice, the inquiry is "whether the probative value of the evidence 'is so significantly outweighed by [its] inherently inflammatory potential as to have a probable capacity to divert the minds of the jurors from a reasonable and fair evaluation of the' issues."  Cole, 229 N.J. at 448 (alteration in original) (quoting State v. Thompson, 59 N.J. 396, 421 (1971)).  "[T]he mere possibility that evidence could be prejudicial does not justify its exclusion." State v. Wakefield, 190 N.J. 397, 429 (2007) (quoting State v. Koskovich, 168 N.J. 448, 486 (2001)).  "It is not enough for the opposing party to show that the evidence could be prejudicial; '[d]amaging evidence usually is very prejudicial

but the question here is whether the risk of <u>undue</u> prejudice was too high.'" <u>Cole</u>, 229 N.J. at 448 (alteration in original) (quoting <u>State v. Morton</u>, 155 N.J. 383, 453-54 (1998)).

Citing our decision in <u>State v. Taylor</u>, 350 N.J. Super. 20 (App. Div. 2002), defendant urges us to similarly conclude that the admission of the BWC videos deprived him of a fair trial. In its responding brief and during argument before us, the State argues the <u>Taylor</u> decision is anachronistic because "the proliferation of video, and particularly BWC [footage], has impacted jurors' degree of trust in the words of witnesses, and police officers especially."

In <u>Taylor</u>, the trial court admitted a video depicting the last three and one-half minutes of the victim's life as a dying declaration of his attacker's identity. 350 N.J. Super. at 35-36. The defendant's identity was captured during the final ten seconds of the recording. <u>Ibid.</u> The preceding three minutes showed the victim struggling for life, gasping, and stating, "ambulance, I'm dying," while people walked in and out of the store stating, "he's gonna die, man." <u>Id.</u> at 36. The video concluded with the arrival of the victim's mother, frantically urging him to identify who stabbed him, and the victim's reply, "in a barely audible whisper, . . . 'Johnny.'" <u>Ibid.</u> One or two jurors were moved to tears by the video, which was played during the State's case-in-chief and again in

22

summation. Ibid. The prosecutor's closing remarks reminded the jury about hearing the victim's "suffering." Ibid.

We held the probative value of the video was minimal because three eyewitnesses testified about the victim's dying declaration at trial and "the potentially prejudicial effect of observing the victim struggling for life [wa]s enormous." Id. at 36-37. The prejudice was compounded by the other three minutes of the video, which "lacked any intrinsic relevance," serving only to further inflame the jury. Id. at 38. We concluded "playing the video twice for the jury deprived [the] defendant of a fair trial." Ibid.

The circumstances in Taylor are distinguishable from those in the present matter, where defendant's primary theory was misidentification. Defendant argued several Henderson factors[6] negatively impacted Faith's ability to identify him at the time of the shooting, i.e., her intoxication, stress, and weapon focus, and poor lighting at the time of the shooting negatively impacted her ability to accurately perceive the shooter, leaving a "hole" in her memory. Defendant urged the jury to reject Faith's testimony in view of her faulty memory.

---

[6] In Henderson, the Court adopted a framework to determine whether the process utilized by police to obtain eyewitness identification of a perpetrator was reliable or impermissibly suggestive, thereby requiring a hearing to determine the identification's admissibility. 208 N.J. at 288-96.

23

Conversely, the victim's ability to perceive his assailant was not part of the defense in <u>Taylor</u>.

The BWC footage provided context for the jury to assess the reliability and credibility of Faith's identification of defendant, a hotly disputed issue in the case. For example, the footage demonstrates Faith answered the officers' questions directly and did not display any overt signs of intoxication that would inhibit her ability to recognize her husband of several years. <u>See</u> <u>State v. Amelio</u>, 197 N.J. 207, 214 (2008) (recognizing "the signs of drunkenness are matters of common knowledge and experience").

Moreover, unlike the victim in <u>Taylor</u>, Faith survived the shooting, testified at trial, and her identification was subject to cross-examination. Further, the footage depicted the extent of the Faith's injuries, a necessary element of the aggravated assault on a domestic violence victim charge, and a factor for the jury's consideration of the attempted murder charge. And unlike the jurors in <u>Taylor</u>, there is no indication in the record that the jury in the present matter was moved to tears upon viewing the video. We therefore conclude those portions of the BWC footage pertaining to Faith's identification of defendant and the extent of her injuries were clearly probative.

In distinguishing our decision in Taylor, however, we are not persuaded by the State's argument that because today's jurors are hesitant to believe witnesses in the absence of video evidence, such evidence was "less important and more cumulative in nature" two decades ago when Taylor was decided.  We therefore next address defendant's contention that the footage nonetheless should have been excluded because its prejudicial effect substantially outweighed its probative value, especially in view of its cumulative nature, graphic imagery, and irrelevant remarks.

Although the evidence contained in the BWC footage was, in part, undoubtedly damaging, "the danger of undue prejudice" did not "outweigh [its] probative value so as to divert jurors 'from a reasonable and fair evaluation of the basic issue of guilt or innocence.'"  See State v. Moore, 122 N.J. 420, 467 (1991) (quoting State v. Sanchez, 224 N.J. Super. 231, 249-50 (App. Div. 1988)).  Here, the BWC footage permitted the jury to assess Faith's demeanor within minutes of the shooting and consider defendant's contention that Faith was intoxicated when she repeatedly stated defendant was the shooter.  Nor are we persuaded that the cumulative nature of the BWC videos warrants reversal.  See State v. Carter, 91 N.J. 86, 114 (1982) ("Evidence that is merely cumulative

A-0486-20

does not create a reasonable possibility that the verdict would have been affected.").

We nonetheless agree with defendant that at least half of the combined BWC footage was not probative of Faith's identification. However, the irrelevant footage does not render the entirety of the footage inadmissible. In hindsight, that footage should have been considered for redaction during the Driver hearing, when efforts were made by both parties to reduce the prejudicial impact of the BWC videos by redacting certain statements, including Faith's references to her TRO against defendant and her prior disclosure to Steve that she feared defendant would attack her.

In any event, any error was harmless in view of the evidence of defendant's guilt at trial. Although, as defendant argues, there only was one identification, no forensic evidence, and no corroborating witnesses to the actual shooting, the victim in this case was married to defendant for several years before the shooting. Moreover, the State presented evidence that defendant continuously stalked Faith after she left the marital home with the couple's two children until the time of the shooting. The quantity of proofs might have been minimal; the nature of the proofs was overwhelming. Finally, we note in its final instructions to the jury, the court instructed: "As jurors, it is your duty to weigh the evidence

26

calmly and without passion, prejudice or sympathy." Model Jury Charge (Criminal), "Final Charge" (rev. Sept. 1, 2022). We presume the jury followed the court's instructions. See State v. Vega-Larregui, 246 N.J. 94, 126 (2021). We therefore conclude any error was harmless. See R. 2:10-2.

We also reject defendant's belated assertion that certain irrelevant statements should have been excluded. Because defendant sought to exclude only the video portions of the video, any error in admitting those statements was invited. See State v. A.R., 213 N.J. 542, 561-62 (2013) (holding "trial errors that were induced, encouraged or acquiesced in or consented to by defense counsel ordinarily are not a basis for reversal on appeal") (quoting State v. Corsaro, 107 N.J. 339, 345 (1987)).

Based on the totality of the circumstances presented here, we cannot conclude the court's admission of the recordings was a "clear error in judgment." Medina, 242 N.J. at 412 (2020).

II.

In his second point, defendant argues the trial court erroneously granted the State's application to charge the jury on flight. Overruling his objection, the court found the testimony that defendant "was apprehended in Florida within a month of the event" permitted a reasonable inference that defendant fled shortly

after the shooting. Defendant does not challenge the language of the specific jury instruction on the flight charge, which substantially tracked the model jury charge on flight, Model Jury Charge (Criminal), "Flight" (rev. May 10, 2010). Instead, he maintains there was an insufficient evidentiary basis for the instruction. For the first time on appeal, defendant contends the State "exacerbated" the error by arguing in summation, "it took the police a month to find him in Florida," without evidentiary support that the police were searching for defendant during that timeframe.

Whether there exists a sufficient evidentiary basis to support a flight charge is within the trial judge's discretion. State v. Long, 119 N.J. 439, 499 (1990). In determining whether to instruct a jury on flight, a judge "must cautiously consider whether, given the peculiar facts in th[e] case, a flight charge is appropriate." State v. Randolph, 228 N.J. 566, 595 (2017). An instruction on flight "is appropriate when there are 'circumstances present and unexplained which . . . reasonably justify an inference that it was done with a consciousness of guilt and pursuant to an effort to avoid an accusation based on that guilt.'" State v. Latney, 415 N.J. Super. 169, 175-76 (App. Div. 2010) (quoting State v. Mann, 132 N.J. 410, 418-19 (1993)). "The jury must be able to find departure

and 'the motive which would turn the departure into flight.'" Id. at 176 (quoting State v. Wilson, 57 N.J. 39, 49 (1970)).

Although evidence presented to support a flight charge must be "intrinsically indicative of a consciousness of guilt," it need not "unequivocally support a reasonable inference of the defendant's guilt." Randolph, 228 N.J. at 595 (quoting State v. Randolph, 441 N.J. Super. 533, 562-63 (App. Div. 2015)). For example, in Wilson, our Supreme Court held that even when evidence could lend itself to multiple interpretations, a flight charge still is appropriate if the evidence presented could allow a jury to "readily infer that [a defendant] fled to avoid apprehension by the police and thereby exhibited consciousness of guilt." 57 N.J. at 49. Accordingly, the Court determined that although the jurors could have attributed an innocent motive to the defendant's abrupt departure, the flight instruction was proper because the evidence also could support a finding that defendant sought to avoid apprehension for the particular crime. Ibid.

At trial through Faith's testimony, the State presented evidence of defendant's pervasive presence in New Jersey during the weeks prior to the shooting. In addition, Cherry Hill Police Detective Michelle Chambers testified that following the shooting, defendant's whereabouts were unknown and during

29

the first week of December 2018, he was arrested in Tampa, Florida by members of the United States Marshall Service's Fugitive Task Force.

We discern no error in the court's issuance of the flight charge. Witness testimony established facts from which the jury could have concluded defendant resided in New Jersey, was consistently present in the state, followed Faith during the weeks leading to the shooting, fled the crime scene after the shooting, and was apprehended one month later in Florida. Consistent with the Court's decision in <u>Wilson</u>, the jury was permitted to accept that testimony and infer defendant "fled to avoid apprehension by the police and thereby exhibited consciousness of guilt." <u>Ibid.</u> Although we agree with defendant that there was no direct evidence police were searching for defendant between the time of the shooting and his arrest in Florida, the prosecutor's comment was a reasonable inference based on the evidence in the record that defendant's whereabouts were unknown. <u>See</u> <u>State v. Blakney</u>, 189 N.J. 88, 96 (2006) (recognizing the prosecutor's "duty is to prove the State's case based on the evidence").

Even if the flight instruction were issued in error, however, any error was harmless because the jury was well aware defendant contested identity. The flight charge did not distract the jury from its primary task of determining defendant's guilt. As is evident from a reading of the entire jury instructions

30

and from defendant's testimony, the jury was informed identity was the main issue in this case. Accordingly, the flight instruction was not clearly capable of producing an unjust result. See R. 2:10-2.

## III.

In his third point, defendant challenges certain comments made during the prosecutor's summation. Defendant argues the prosecutor expressed her opinion regarding defendant's guilt, bolstered Faith's credibility, and denigrated the defense. At the conclusion of the State's summation, defendant only objected to one of those remarks. Defendant asserts the prosecutor's improper comments were especially prejudicial because the State's case hinged on the credibility of Faith's testimony and the cumulative effect of the comments deprived defendant of a fair trial and require reversal. Having reviewed the prosecutor's summation "within the context of the trial as a whole," State v. Feaster, 156 N.J. 1, 64 (1998), we reject defendant's contentions.

In reviewing a claim of prosecutorial misconduct, we consider whether: defense counsel raised "timely and proper objections"; "the offending remarks 'were withdrawn promptly'"; "the trial court struck the remarks and provided appropriate instructions to the jury"; and "the offending remarks were prompted by comments in the summation of defense counsel." State v. Smith, 212 N.J.

31

365, 403-04 (2012) (quoting State v. Frost, 158 N.J. 76, 83 (1999)). "Generally, if no objection was made to the improper remarks, the remarks will not be deemed prejudicial." State v. R.B., 183 N.J. 308, 333 (2005). Conversely, an objection made immediately after summation is considered timely because it affords the trial judge the opportunity to take curative action. See e.g., State v. Bauman, 298 N.J. Super. 176, 207 (App. Div. 1997); State v. Farrell, 61 N.J. 99, 106 (1972). Proper curative instructions generally remove the potential prejudice resulting from improper closing remarks. See Smith, 212 N.J. at 409.

New Jersey courts have long recognized prosecutors "are afforded considerable leeway in making opening statements and summations." State v. Williams, 113 N.J. 393, 447 (1988). They may even do so "graphically and forcefully." State v. Pratt, 226 N.J. Super. 307, 323 (App. Div. 1988).

Nonetheless, "the primary duty of a prosecutor is not to obtain convictions but to see that justice is done." Smith, 212 N.J. at 402-03. A prosecutor's "duty is to prove the State's case based on the evidence and not to play on the passions of the jury or trigger emotional flashpoints, deflecting attention from the hard facts on which the State's case must rise or fall." Blakney, 189 N.J. at 96. "A prosecutor must 'conscientiously and ethically undertak[e] the difficult task of maintaining the precarious balance between promoting justice and achieving a

32

conviction,' ensuring that at all times his or her 'remarks and actions [are] consistent with his or her duty to ensure that justice is achieved.'" State v. Jackson, 211 N.J. 394, 408 (2012) (alterations in original) (quoting Williams, 113 N.J. at 447-48).

Even if the prosecutor exceeds the bounds of proper conduct, that finding does not end our inquiry "because, in order to justify reversal, the misconduct must have been 'so egregious that it deprived the defendant of a fair trial.'" State v. Smith, 167 N.J. 158, 181 (2001) (quoting Frost, 158 N.J. at 83). "To justify reversal, the prosecutor's conduct must have been clearly and unmistakably improper, and must have substantially prejudiced defendant's fundamental right to have a jury fairly evaluate the merits of his defense." State v. Timmendequas, 161 N.J. 515, 575 (1999).

Against these well-established principles, we consider the prosecutor's comments at issue.

A. Personal Opinion Regarding Guilt

Defendant first asserts the prosecutor improperly expressed her "personal or official opinion or belief" in defendant's guilt, by twice informing the jury the State had arrested "the right guy." Defendant did not object to the comments at trial. The State counters the comments responded to defendant's closing

argument that the State's investigation was deficient, and the comments were based on the evidence adduced at trial.

The defense theory of the case was misidentification. To drive that point home, defense counsel stated "they got the wrong guy" eight times during his summation. The defense also highlighted the State's failure to corroborate Faith's identification of the shooter through DNA and fingerprint evidence. Defendant further argued the State failed to produce telephone records or call witnesses to corroborate Faith's allegation that defendant had stalked her prior to the shooting.

"Our Supreme Court has disapproved of any expression of personal or official opinion or belief that a jury could understand as based on something other than the evidence, including a belief in the defendant's guilt 'unless [the prosecutor] makes it perfectly plain that his [or her] belief is based solely on the evidence that has been introduced at the trial.'" State v. Rivera, 437 N.J. Super. 434, 445-46 (App. Div. 2014) (quoting State v. Thornton, 38 N.J. 380, 398 (1962) (first alteration in original)). According to the Court "such statements may add the weight of the prosecutor's official and personal influence and knowledge to the probative force of the evidence adduced, thus creating the possibility that the jurors consciously or unconsciously might adopt the

prosecutor's view without applying their own independent judgment to the evidence. Thornton, 38 N.J. at 398.

In the present matter, the prosecutor's remarks were made in direct response to the defense counsel's closing argument. See State v. Munoz, 340 N.J. Super. 204, 216 (App. Div. 2001) ("A prosecutor is permitted to respond to an argument raised by the defense so long as it does not constitute a foray beyond the evidence adduced at trial."). Further, the disputed comments were tied to the evidence adduced at trial. Thus, any suggestion that the prosecutor or law enforcement team believed in defendant's guilt was not based on evidence outside the record.

## B. Bolstering the Victim's Credibility

Defendant contends the prosecutor made other inappropriate comments during summation which bolstered Faith's credibility and cumulatively deprived him of a fair trial. Other than the prosecutor's rhetorical question, "why would she lie," defendant did not object to the prosecutor's other comments, which informed the jury that the lack of corroborative evidence or witnesses "doesn't matter" because the "best evidence" was adduced through Faith's testimony.

A prosecutor may argue that a witness is credible, "so long as the prosecutor does not personally vouch for the witness or refer to matters outside

the record as support for the witness's credibility."  State v. Walden, 370 N.J. Super. 549, 560 (App. Div. 2004).  "A prosecutor is not forced to idly sit as a defense attorney attacks the credibility of the State's witnesses; a response is permitted."  State v. Hawk, 327 N.J. Super. 276, 284 (App. Div. 2000).

Although defense counsel did not explicitly contend Faith was lying during his summation, he framed his arguments as "misidentification" in view of Faith's "stress" and "intoxication"; the presence of a weapon; and "bad lighting" at the scene to contend Faith's honest belief that defendant shot her was caused by her clouded perception.  In essence, defense counsel's summation challenged Faith's credibility – not by calling her a liar – but by pointing out the various factors that might have affected her ability to identify defendant as the shooter.

Further, defense counsel argued the prosecutor failed to corroborate Faith's stalking allegations by introducing into evidence Faith's phone records or calling other witnesses.  The prosecutor responded to this argument by asking the jury, "Why would she lie?  She had no reason to lie."

Although the prosecutor did not personally vouch for Faith's credibility, her rhetorical question and answer skirted the line between fair comment and misconduct.  However, when viewed in the context of defense counsel's closing

arguments, which opened the door for the prosecutor's comments; the entirety of the prosecutor's summation; and "the trial as a whole," Feaster, 156 N.J. at 64, we find no showing that defendant was deprived of a fair trial. Moreover, in its final charge, the court issued the standard instruction that "[a]rguments, statements, remarks, openings and summations of counsel are not evidence and must not be treated as evidence." Model Jury Charge (Criminal), "Final Charge" (rev. Sept. 1, 2022). Again, we presume the court's instructions were followed. See Vega-Larregui, 246 N.J. at 126.

## C. Casting Aspersions on the Defense

Defendant claims the prosecutor twice denigrated the defense by characterizing as "ridiculous" its theory that Faith misidentified the shooter because: (1) the parking lot was dark; and (2) she had been drinking. We agree that the State's characterization of the defense theory as "ridiculous" was out of bounds. A prosecutor is "not permitted to cast unjustified aspersions on the defense or defense counsel." Smith, 167 N.J. at 177.

While improper, however, the prosecutor's remarks were not so egregious that they "substantially prejudiced defendant's fundamental right to have a jury fairly evaluate the merits of his defense." Wakefield, 190 N.J. at 438 (quoting State v. Papasavvas, 163 N.J. 565, 625 (2000)). Both comments were tethered

37

to the prosecutor's beseeching the jurors to use "everyday common sense" and ask themselves whether "it ma[d]e sense that [a] woman who was married to a man for eight years wouldn't know him from the front, from the back, in the light in the dark?"

Because defendant failed to object to the remarks at the time of trial, we review the prosecutor's comments for plain error. R. 2:10-2. In view of the court's final instruction on the jury's function in considering the arguments of counsel, and the State's emphasis on the relationship between defendant and the victim, we conclude the remarks were not "so egregious that [they] deprived the defendant of a fair trial," State v. McGuire, 419 N.J. Super. 88, 139 (App. Div. 2011), nor "clearly capable of producing an unjust result," R. 2:10-2.

## IV.

Alternatively, defendant argues his sentence is excessive. He asserts "the court paid lip service to the Yarbough factors" and failed to explicitly assess the overall fairness of the three consecutive sentences imposed, in contravention of the Court's holding in Torres. Defendant does not challenge the court's assessment of aggravating and mitigating factors. See N.J.S.A. 2C:44-1(a) and (b). The State acknowledges the court failed to articulate the requisite overall fairness assessment but defers to this court's discretion as to whether remand is

necessary.  For the reasons that follow, we agree that a limited remand is necessary for the court to comply with Torres.

Ordinarily, we defer to the sentencing court's determination, State v. Fuentes, 217 N.J. 57, 70 (2014), and do not "substitute [our] judgment" for that of the sentencing court, State v. Case, 220 N.J. 49, 65 (2014).  We will not disturb a sentence that is not manifestly excessive or unduly punitive, does not constitute an abuse of discretion, and does not shock the judicial conscience.  See State v. O'Donnell, 117 N.J. 210, 215-16 (1989).  However, our deference "applies only if the trial judge follows the Code and the basic precepts that channel sentencing discretion."  Case, 220 N.J. at 65.

"[T]rial judges have discretion to decide if sentences should run concurrently or consecutively."  State v. Miller, 205 N.J. 109, 128 (2011); see also N.J.S.A. 2C:44-5(a).  Judges are permitted to impose consecutive sentences where multiple sentences of imprisonment are imposed and after considering the Yarbough factors.  A "sentencing court must explain its decision to impose concurrent or consecutive sentences in a given case."  State v. Cuff, 239 N.J. 321, 348 (2019).  "When a sentencing court properly evaluates the Yarbough factors in light of the record, the court's decision will not normally be disturbed on appeal."  Miller, 205 N.J. at 129.

A-0486-20

Similar to the statutory aggravating and mitigating factors, "[t]he Yarbough factors are qualitative, not quantitative," and "applying them involves more than merely counting the factors favoring each alternative outcome." Cuff, 239 N.J. at 348. Instead, the sentencing court must consider all the Yarbough guidelines, with emphasis on the five subparts of the third guideline. State v. Rogers, 124 N.J. 113, 121 (1991). In applying the factors, "[t]he focus should be on the fairness of the overall sentence, and the sentencing court should set forth in detail its reasons for concluding that a particular sentence is warranted." State v. Miller, 108 N.J. 112, 122 (1987).

In its assessment of the Yarbough factors that supported consecutive sentences in this case, the court found "there can be no free crimes in a system for which the punishment shall fit the crime," under the first factor. The court also found "stalking is a completely separate offense from the attempted murder charge[]"; "the crimes and their objectives were predominately independent of each other" and defendant stalked Faith "on diverse dates and at separate places." Those findings demonstrate the court fully considered the pertinent criteria under the third factor: "the crimes and their objectives were predominantly independent of each other"; "the crimes involved separate acts of violence or threats of violence"; and "the crimes were committed at different

times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior." The court's reasons hardly constituted "lip service" to the requisite Yarbough factors.

While this appeal was pending, however, the Court issued its decision in Torres, exhaustively reviewing the Yarbough factors while reaffirming the discretionary authority of sentencing courts to impose consecutive sentences by using those guidelines. Torres, 246 N.J. at 264-66. The Court reiterated that Yarbough requires the court place on the record "[a]n explicit statement" of reasons for imposing consecutive sentences, which should address the overall fairness of the sentence. Id. at 267-68 (citing Miller, 108 N.J. at 122).

Although the court in the present matter properly assessed the applicable Yarbough factors, the court did not, however, explicitly address the overall fairness of the consecutive sentences imposed on defendant. Consistent with the Court's advisement in Torres, we therefore remand for the court to provide "[a]n explicit statement, explaining the overall fairness" of defendant's aggregate sentence. 246 N.J. at 268. The scope of the remand, however, should be limited to an analysis of the overall fairness of the aggregate sentence imposed, rather than constituting a full resentencing. See State v. Randolph, 210 N.J. 330, 353 (2012) (explaining that a remand "for a statement of reasons

on the record for the imposition of consecutive sentences" is limited in scope and excludes reconsideration of sentencing factors).  Defendant does not argue otherwise.

To the extent we have not addressed a particular argument, it is because either our disposition makes it unnecessary, or the argument was without sufficient merit to warrant discussion in a written opinion.  R. 2:11-3(e)(2).

Affirmed in part and remanded for the limited purpose of rendering a fairness determination under Torres.  We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION